Marilyn J. HENRY, Respondent,

v.

MISSOURI DEPARTMENT OF
MENTAL HEALTH,
Appellant.

No. WD 72667.

Missouri Court of Appeals,
Western District.

Aug. 9, 2011.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 4, 2011.

Application for Transfer Denied
Dec. 6, 2011.

Daryl R. Taylor, Kansas City, MO, for Appellant.

Daniel E. Hunt, Jefferson City, MO, for Respondent.

Before JAMES EDWARD WELSH, P.J., JAMES M. SMART and JOSEPH M. ELLIS, JJ.

JAMES EDWARD WELSH, Presiding Judge.

This is an appeal from the judgment of the circuit court reversing the Personnel Advisory Board's (PAB) decision, which affirmed the Missouri Department of Mental Health's (Department) decision to dis-

miss Marilyn J. Henry from her merit system position with the Department. Although the Department filed the appeal as the party aggrieved by the circuit court's decision, under Rule 84.05(e)[1] Henry filed the appellant's brief because she was aggrieved by the PAB's decision. In her sole point on appeal Henry contends that the PAB's decision that she should be terminated from employment was not based upon substantial and competent evidence, was unreasonable, arbitrary, and capricious, and was an abuse of discretion. In particular, Henry asserts that the evidence was insufficient to establish that she abused a client at the hospital or that she violated any Department guidelines or rules. We agree and affirm the circuit court's judgment. The PAB's rationale for its decision upholding Henry's termination was not supported by substantial and competent evidence and was, therefore, unreasonable.

The evidence established that Henry worked as a Registered Nurse III at the Biggs Forensics Center of the Fulton State Hospital, which is a facility operated by the Department. On January 20, 2008, during one of her shifts, Henry participated in the care and restraint of P.G., a patient confined at the Fulton State Hospital. P.G. has a history of abuse and is very violent. During restraints, P.G. is known to spit, bite, hit, and head butt.

On January 20, 2008, P.G. attempted to bite a staff member as he was walking him down a hallway. Staff members then forced P.G. to the floor of the hallway. While on the floor, P.G. began flailing his body, banging his head, and yelling. He hit his head on the floor and chipped his tooth. A staff member then held P.G.'s head. Thereafter, Henry arrived to assist the other staff members in restraining P.G. While restraining P.G., a staff member placed on P.G. a spit sock, which is like a surgical mask placed over a patient's mouth to prevent the spread of disease from bodily fluids. At one point, Henry put her hand on P.G.'s face while the other staff members finished restraining P.G. Staff members then transported P.G. on a stretcher into the restraint room.

Once P.G. was placed on the bed in the restraint room, Henry stayed by P.G.'s head as up to ten other staff members worked to get P.B. off the stretcher and into the restraints. For approximately six minutes, Henry held P.G.'s head and frequently adjusted the spit sock around P.G.'s head while other staff members placed P.G.'s arms and legs in the restraints. When P.G. attempted to lift or turn his head, Henry would try to hold P.G.'s head in place. As Henry prepared to give a sedative injection to P.G., another staff member moved in to hold P.G.'s head. Throughout the incident, P.G. was screaming and repeatedly yelled that he could not breathe. He also yelled such things as "Get off my nose," "Get off my fucking throat," and "Get your hands off my fucking mouth." Once P.G. was secure in the restraints and had been given a sedative, Henry and the staff members left the room. The entire incident—from the point that P.G. tried to bite the staff member in the hallway to the point that the staff

1. Rule 84.05(e) says:

If the circuit court reverses a decision of an administrative agency and the appellate court reviews the decision of the agency rather than of the circuit court, a party aggrieved by the circuit court decision shall file a notice of appeal and the record on appeal and shall file with the record on appeal a notice designating the party that is aggrieved by the agency decision. The party aggrieved by the agency decision shall file the appellant's brief and reply brief, if any, and serve them within the time otherwise required for the appellant to serve briefs.

restrained, sedated, and left P.G. in the room—was captured on video by the building's video system.

Prior to this incident with P.G., Henry had received training concerning the Department's views on holding a client's head during restraints. The program nurse manager had sent Henry the minutes from the Nurse Leadership Council's meeting in December 2007, which "clarified that staff are not to hold the patient's head down, nor are they to put any pressure on the face or neck[.]" Henry was also present at a nurse's morning shift report meeting in early January 2008 where the topic of holding a patient's head was discussed. Some of the nurses expressed concern that, although they knew they were not supposed to hold a client's head, they were not sure what to do if a client was banging his head on the floor. They discussed solutions such as putting a towel or something underneath the client's head. The program nurse manager told the nurses they could not place their hands on the client's face or apply pressure anywhere on the face. She wanted to ensure that the nurses were getting their hands off the clients' heads and told the nurses "don't be holding the heads."

Fulton State Hospital Policy 4.201 defined physical restraint as "[a]ny manual method or physical or mechanical device, material, or equipment that immobilizes or reduces the ability of an individual to move his or her arms, legs, body or head freely." Moreover, Fulton State Hospital Policy 4.201 required employees to use "[o]nly approved principles and techniques consistent with PRO ACT for physical or mechanical restraints." Five days before the incident with P.G., Henry attended a refresher training class for PRO ACT. The packet for this training said that during restraints "[s]taff must constantly assess breathing and circulation." During this training, Henry acknowledges that the instructor told her not to touch or hold a client's head during restraints or it would result in automatic dismissal. Henry asked the instructor whether there was a written policy on this, and the instructor said no. According to Henry, she had worked at the hospital long enough to know that, if it was not in writing, it was "a grey area." So, she decided that, until there was a written policy, she would do what she had to do to keep the patient and staff safe.

After the restraining incident on January 20, P.G. filed a grievance concerning his treatment. An investigation ensued, which ultimately resulted in Henry's dismissal from her position with the hospital. By letter dated April 29, 2008, Marty Martin, the Appointing Authority and the Chief Operating Officer of Fulton, notified Henry that she was dismissed from her employment as a registered nurse with Fulton State Hospital based upon her actions during the restraint of P.G. on January 20, 2008. The letter said:

The reason for your dismissal is your inappropriate actions during the restraint of a client. Your actions were not consistent with the training you received in ProAct. This disciplinary action is taken in accordance with including, but not limited to, 1 CSR 20–3.070(2)(B), (I), (L), the DMH Employee Handbook, Hospital Policy 2.310. Additionally, your dismissal is required pursuant to DOR 2.205.

The specific facts supporting the reason for your dismissal are as follows: On or about January 20, 2008, at approximately 2:15 p.m. a spit sock was applied to client's P.G.'s head. At approximately 2:23 p.m. client P.G. was being placed in restraints when you placed your right hand on his chin and your left hand on his forehead. After that you placed you

hands on the right side of P.G.'s head pressing down on his head with your elbows in a locked position. You continued to move your hands in different locations on P.G.'s head. You held P.G.'s head and the spit sock for approximately six (6) minutes. Your actions were inappropriate and could have resulted in serious injury of the client's neck or spine or the client's ability to breathe. You used more force than was reasonable or necessary for P.G.'s proper control, treatment or management. Based on your conduct (as described above), I have determined that your dismissal from employment is justified and that it serves the good of the service and the efficient administration thereof.... [I]t is expected without exception that no employee will engage in physically abuse behavior toward our clients.

. . . .

Furthermore, based on your conduct (as described above), I am making a preliminary determination of one (1) count of physical abuse. Department Operating Regulation (DOR) 2.205 defines physical abuse as "1. An employee purposefully beating, striking, wounding or injuring any consumer; 2. In any manner whatsoever, an employee mistreating or maltreating a consumer in a brutal or inhumane manner[;] 3. Physical abuse includes handling a consumer with any more force than is reasonable for a consumer's proper control, treatment or management."

The letter also informed Henry that, because of the preliminary determination of physical abuse, she was at risk for being placed on the Department's Disqualification Registry. If she was placed on the Disqualification Registry, Henry could not be employed by the Department of Mental Health or any of its facilities, and she could not be licensed, employed, or provide services at a residential facility, day program or service that is licensed, certified, or funded by the Department. The letter further informed Henry that she could meet with Martin concerning her dismissal and that Henry could provide further information about the case.

On May 5, 2008, Henry met with Martin to discuss her dismissal. By letter dated May 13, 2008, Martin notified Henry that she had not changed her decision to dismiss Henry from her job. The letter informed Henry that Martin still believed the allegations against Henry to be true and that Martin was going to substantiate that Henry committed one count of physical abuse.

Thereafter, Henry appealed Martin's decision to the PAB. The PAB upheld Martin's decision and found that Henry's dismissal was for the good of the service and that she handled P.G. with more force than was reasonable for his proper control, treatment and management. The PAB concluded:

[Martin] carried her burden of proof that [Henry] was familiar with the policies on abuse and restraint and violated them and her Pro–ACT training. She was incompetent, inadequate, careless and inefficient in the performance of the duties of her position and failed to meet established minimum standards in the performance of those duties. She handled PG with more force than was reasonable for his proper control, treatment and management.

The detrimental aspects of [Henry's] conduct of inappropriately restraining PG were substantial, directly related to her duties, and detrimental to the public's interest in a well-run mental health facility. Her continued tenure was harmful to the interests of the Appointing Authority, of the service, and of the

public. [Henry's] dismissal serves the good of the service.

Subsequently, Henry filed a petition for judicial review with the Circuit Court of Cole County. The circuit court found that the PAB's decision was unlawful, unreasonable, and unsupported by substantial and competent evidence on the record as a whole. This appeal followed.

■ In an appeal following judicial review of an administrative agency's decision, this court reviews the decision of the agency and not the judgment of the circuit court. *Coffer v. Wasson–Hunt*, 281 S.W.3d 308, 310 (Mo. banc 2009). Pursuant to Mo. Const. art. V, § 18 and § 536.140, RSMo Cum.Supp.2010, we must determine "whether the agency's findings are supported by competent and substantial evidence on the record as a whole; whether the decision is arbitrary, capricious, unreasonable or involves an abuse of discretion; or whether the decision is unauthorized by law." *Coffer*, 281 S.W.3d at 310 (citation and internal quotation marks omitted).

■ On appeal of an agency's decision, this court considers the entire record to determine whether the decision is supported by competent and substantial evidence, but "[w]e may not substitute our judgment on the evidence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses." *Stacy v. Harris*, 321 S.W.3d 388, 393–94 (Mo.App.2010) (citation and internal quotation marks omitted). We "must look to the whole record in reviewing the Board's decision, not merely at that evidence that supports its decision," and we no longer view the evidence in the light most favorable to the agency's decision. *Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 791 (Mo. banc 2004).

■ Henry contends that the PAB's decision that she should be terminated from employment was not based upon substantial and competent evidence, was unreasonable, arbitrary, and capricious, and was an abuse of discretion. In particular, she asserts that the evidence was insufficient to establish that she abused a client at the hospital or that she violated any Department guidelines or rules. We agree.

■ The appointing authority may dismiss a merit employee "for cause" if "such action is required in the interests of efficient administration and ... the good of the service will be served thereby." § 36.380, RSMo 2000; 1 CSR 20–3.070(5).[2] "Although not defined by the statutes, the standard 'for the good of the service' implies some personal misconduct or fact that renders the employee's further employment harmful to the public interest." *Lombardi v. Dunlap*, 103 S.W.3d 786, 791 (Mo.App.2003). The burden of proof is on the employing agency to establish grounds for dismissal. *Mo. Veterans Home v. Bohrer*, 849 S.W.2d 77, 78 (Mo.App.1993). Before dismissing an employee, the appointing authority must determine that cause exists for dismissal and that the dismissal serves the good of the service. *Prenger v. Moody*, 845 S.W.2d 68, 76 (Mo. App.1992). The regulations pertaining to merit employees provide a nonexclusive list of causes for dismissal. *See* 1 CSR 20–3.070(2). In this case, the PAB found that Henry's actions constituted cause for dismissal under 1 CSR 20.3.070(2)(B) and (L)

and that her dismissal was for the good of the service.

Further, the PAB found that Henry's actions constituted physical abuse and that mandatory termination of employment was required by Department Operating Regulation ("DOR") 2.205. Under DOR 2.205, if the head of a Department facility suspects an employee has subjected a patient to physical abuse, the head of the facility must report the incident to the Department's investigation unit. *See, e.g.,* § 630.165, RSMo; DOR 2.205. If allegations of abuse are substantiated against an employee, the Department must dismiss the employee and place the employee's name on the Department's Disqualification Registry. *See, e.g.,* § 630.170 RSMo; DOR 2.205 (anyone placed on the Disqualification Registry is barred from future employment with the Department).

The two bases for Henry's dismissal-for the good of the service under § 36.380 and mandatory termination under DOR 2.205– are separate and independent. We, therefore, will address these reasons separately.

The PAB determined that Henry's dismissal was for the good of the service because cause existed to dismiss Henry under 1 CSR 20–3.070(2)(B) and (L). Regulation 1 CSR 20–3.070(2) says:

> The following are declared to be causes for suspension, demotion or dismissal of any employee in the classified service, depending upon the seriousness of the cause; however, those actions may be based upon causes other than those enumerated in the rule, namely, that the employee:
>
> . . . .
>
> (B) Is incompetent, inadequate, careless or inefficient in the performance of the duties of his/her position (specific instances to be charged) or has failed to meet established minimum standards in the performance of those duties;

. . . .

> (L) Has willfully violated the lawful regulations or policies of the agency by which employed after having been made aware of the regulations and policies.

In particular, the PAB found that the appointing authority had carried her burden of proof that Henry was familiar with the policies on abuse and restraint and violated them and her PRO ACT training and that Henry was incompetent, inadequate, careless, and inefficient in the performance of the duties of her position and failed to meet established minimum standards in the performance of those duties.

To carry her burden of proof under 1 CSR 20–3.070(2)(L), the appointing authority had to show that Henry willfully violated Fulton State Hospital's regulations and policies. Proving that Henry knew of the regulations and policies before violating them and that she acted with the intention to violate or to fail to obey the regulations and policies is sufficient to show willfulness. *Burgess v. Ferguson Reorganized School Dist. R–2,* 820 S.W.2d 651, 656 (Mo. App.1991). The regulations and policies which Henry is alleged to have violated are Fulton Hospital Policy 4.201 and Fulton Nursing Policy VII–N.007.

Fulton Hospital Policy 4.201 states that employees must use "[o]nly approved principles and techniques consistent with PRO ACT for physical or mechanical restraints." A physical restraint is defined as "[a]ny manual method or physical or mechanical device, material, or equipment that immobilizes or reduced the ability of any individual to move his arms, legs, body or head freely." Fulton Hospital Policy 4.201.

The crux of this case is whether Henry's failure to follow an oral admonition given by a PRO ACT instructor at a training session to not hold a client's head during a

restraint was a violation of Fulton Hospital Policy 4.201 and Fulton Nursing Policy VII–N.007. Although Fulton Hospital Policy 4.201 states that employees must use "only approved principles and techniques consistent with PRO ACT for physical or mechanical restraints," the written PRO ACT material submitted at the administrative hearing do not prohibit holding a client's head during a restraint. Indeed, the PRO ACT material submitted on the record merely states that "[s]taff must constantly assess breathing and circulation." The appointing authority, however, relies on the verbal instruction from the PRO ACT instructor to set forth Fulton State Hospital's policy prohibiting a staff member from holding a client's head during a restraint. The instructor said that, if a staff member held a client's head during a restraint, it would result in automatic dismissal. But, when Henry asked the instructor whether there was a written policy on this, the instructor said no.

The evidence established that Fulton State Hospital management had decided to make discouraging the holding of a client's head a priority. Indeed, at the Nurse Leadership Council meeting, nurses were told not to hold the patient's head down and not to put any pressure on a client's face or neck. Further, at a nurse's morning shift report meeting, nurses were told that they could not place their hands on the client's face or apply pressure anywhere on the face. The program nurse manager said that she wanted to ensure that the nurses were getting their hands off the clients' heads and that she told the nurses "don't be holding the heads." The program nurse manager acknowledged, however, that the nurses were frustrated over the lack of clear guidance in the area concerning holding or touching the client's head. Indeed, nurses were allowed to touch a client's head and face during a restraint as long as breathing was not restricted and the client was not endangered.

Despite the confusion, the Department contends that any confusion was eliminated as a result of the oral admonition given to the staff during the PRO ACT training session. The Department essentially asserts that the instructor's statement that "there was to be absolutely no holding of the client's head at all" had the force and effect to be included in Fulton State Hospital's Policy 4.201 the moment it was uttered and that the oral admonition became an approved principle and technique consistent with PRO ACT for physical restraints. We disagree.

Had Fulton State Hospital management wanted to institute a written policy to prohibit the holding of a client's head, it could have done so. As it stands, Fulton State Hospital Policy 4.201 defined physical restraint as "[a]ny manual method or physical or mechanical device, material, or equipment that immobilizes or reduces the ability of an individual to move his or her arms, legs, body or head freely." Thus, the written policy of the hospital included within its definition of physical restraint the ability to use a method or device to reduce the ability of a client to move his head freely. It appears, therefore, that some type of restraint of the head could be appropriate. If the hospital's management wanted to prohibit some methods of restraining the head, it should have done so in a written policy or in written PRO ACT materials that stated what conduct was permitted or should be prohibited.

The oral admonition given by the instructor during the PRO ACT training was a blanket statement that absolutely prohibited the holding of a client's head at all. But, even the appointing authority recognized that touching the client's head may be necessary when applying a spit sock to

a client and that, in some circumstances, staff may have to grasp the material of the spit sock and hold it down with pressure being applied to the top of the client's head and not against the mouth or nose. The appointing authority also said that it was appropriate for staff to manage the client's head by placing their hands on each side of the client's head but not apply any pressure. Thus, the oral admonition given at the PRO ACT training prohibiting holding a client's head would even be contrary to the appointing authority's understanding of what was appropriate in regard to holding a client's head. The oral admonition, therefore, does not automatically become incorporated into Fulton Hospital Policy 4.201 as an approved principle consistent with PRO ACT for physical restraints. Therefore, the evidence did not establish that Henry engaged in a physical restraint that was not consistent with PRO ACT. Thus, the PAB's decision that Henry violated Fulton Hospital Policy 4.201 was not supported by substantial and competent evidence and was unreasonable.

■ The PAB also found that Henry violated Fulton Nursing Policy VII–N.007. That policy states that "[p]rohibited as restraint techniques are those that interfere with breathing such as choking, covering the mouth or nose with a towel or other items, and sitting on the chest, etc." A review of the video clearly indicates that Henry did not choke P.G., cover his mouth or nose with a towel or other item or sit on his chest. Although the Department complains that Henry put her hands over P.G.'s mouth and nose, Fulton Nursing Policy VII–N.007 does not deal with the placement of the hands over the mouth or nose. The policy concerns covering the mouth or nose with a towel or some type of "item." Moreover, the video shows that P.G. yells frequently and loudly throughout the entire restraining procedure. It is

apparent from the video that P.G.'s breathing was not restricted. Thus, to the extent that the PAB found that Henry violated Fulton Nursing Policy VII–N.007, its decision was not supported by competent and substantial evidence and was unreasonable.

The evidence was insufficient to establish that Henry willfully violated the lawful regulations or policies of the hospital. Therefore, the PAB's decision that Henry's dismissal was for the good of the service because she violated 1 CSR 20–3.070(2)(L) was not supported by competent and substantial evidence and was unreasonable.

The Department also argues that Henry's dismissal was supported by a violation of 1 CSR 20–3.070(2)(B). That regulation says that an employee may be dismissed if she is "incompetent, inadequate, careless or inefficient in the performance of the duties of his/her position (specific instances to be charged) or has failed to meet established minimum standards in the performance of those duties[.]" In particular, the Department asserts that this section applies because Henry incompetently performed her duties by failing to properly assess the patient's breathing as required by the PRO ACT Refresher Training packet. The PAB, however, did not make a finding that Henry failed to assess the client's breathing as ground for its decision.

■ The PAB found that Henry violated Fulton Hospital Policy 4.201 by holding the client's head in violation of the oral admonition given during the PRO ACT training and violated Fulton Nursing Policy VII–N.007 by interfering with the client's breathing by covering the mouth or nose with an item. Based upon these actions, the PAB found that Henry was incompetent, inadequate, careless, and inefficient in the performance of the duties of

her position and that she failed to meet established minimum standards in the performance of those duties. As we previously noted, no competent and substantial evidence supported the PAB's decision that Henry violated Fulton Hospital Policy 4.201 or Fulton Nursing Policy VII–N.007. Therefore, the PAB's decision that cause existed to dismiss Henry pursuant to 1 CSR 20–3.070(2)(B) was also not supported by competent and substantial evidence and was unreasonable. At no time did the PAB find that Henry was incompetent, inadequate, careless, and inefficient in the performance of the duties of her position or that she failed to meet established minimum standards in the performance of those duties by failing to assess the client's breathing.

■ Finally, the Department contends that Henry's actions during the restraint of P.G. also violated DOR 2.205. Under DOR 2.205, if an employee subjects a patient to physical abuse, the employee shall not be employed by the Department. "Physical abuse includes handling a consumer with any more force than is reasonable for a consumer's proper control, treatment or management." DOR 2.205(1)(I)(3).

The PAB found that Henry handled P.G. with more force than was reasonable for his proper control, treatment, and management based upon Henry's alleged violations of Fulton Hospital Policy 4.201 and Fulton Nursing Policy VII–N.007. The PAB's decision was not based upon a specific finding that the actions it saw in the video, standing on their own, constituted abuse. Rather, the basis for the PAB's decision that Henry abused P.G. was based upon Henry's holding of P.G.'s head during the restraint in violation of the verbal directive given in the PRO ACT training and Fulton Hospital Policy 4.201 and Henry's placement of her hand allegedly over P.G.'s mouth and nose during the restraint in violation of Fulton Nursing Policy VII–N.007. As previously discussed, the evidence does not establish that Henry violated either policy. Thus, the PAB's decision that that Henry physically abused P.G. in violation of DOR 2.205 was also not supported by competent and substantial evidence and was unreasonable.

We note, however, that even though Henry's actions did not rise to the level of physical abuse or violations of the Department's regulations and policies, her actions were most certainly insubordinate. She readily admits that she was told during the PRO ACT training that she should not hold a client's head during a restraint. She was openly hostile to what the instructor was telling her and hostile to the philosophies and preferences of Fulton State Hospital regarding head restraints. Indeed, just a few days after the training, Henry ignored the training and held a client's head during a restraint. But, Martin did not dismiss Henry for being insubordinate. Martin dismissed Henry from her employment based upon Martin's finding that Henry's dismissal was for the good of the service because of Henry's violation of hospital's policies and based upon her finding that Henry abused a client in violation of DOR 2.205. However, the lack of competent and substantial evidence to support these findings prohibits Henry's dismissal on these grounds.

If an employee is instructed to perform her job in a particular manner and she refuses to do so, certainly an employer may discharge her from her employment for the good of the service. But, the failure to follow directions does not make otherwise acceptable actions abusive or a violation of the employer's written regulations and policies. Neither does it make otherwise acceptable behavior incompetent, inadequate, careless or inefficient,

nor does it indicate that such behavior fails to meet minimum standards of the profession. There is no evidence of abuse or incompetence in this case, and there is insufficient evidence to support the agency's findings of any violations of the employer's regulations and policies. The Department may not terminate Henry for these reasons without substantial evidence of at least one of the cited reasons.

We, therefore, affirm the circuit court's judgment vacating the PAB's decision terminating Henry from her employment with the Department.

All concur.