MISSOURI VETERANS HOME, Eric J. Endsley, Administrator, Missouri Veterans Commission, Appellants,

v.

Verna J. BROWN, Respondent.

No. WD74289.

Missouri Court of Appeals,
Western District.

July 17, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 2012.

Kevin R. Hall, Jefferson City, MO, for appellants.

Ronnie L. Podolefsky, Buffalo, NY, for respondent.

Before Special Division: LISA WHITE HARDWICK, Chief Judge, Presiding, KAREN KING MITCHELL, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

Missouri Veterans Home, Eric J. Endsley ("Endsley"), the Administrator and Appointing Authority of the MVH, and the Missouri Veterans Commission (collectively "MVH") appeal the decision of the Personnel Advisory Board ("PAB") disapproving the dismissal of Verna Brown ("Brown"), a merit employee, and ordering her reinstatement with back pay ("PAB's Decision"). MVH contends that the PAB's Decision (1) is unauthorized by law because it declares the use of other staff to assist in the performance of job duties to be a reasonable accommodation contrary to MVH internal policy and to case law interpreting the Americans with Disabilities Act ("ADA");[1] and (2) is not supported by competent and substantial evidence, is arbitrary and unreasonable, and constitutes an abuse of discretion. We affirm the trial court's judgment affirming the PAB's Decision.

---

[1]. 42 U.S.C. Section 12101 *et. seq.*

**Factual and Procedural History**

Missouri Veterans Home is a facility maintained by the Missouri Veterans Commission for the care of veterans who require institutional health care services. Brown, a diplomaed nurse since 1981, was employed by MVH as a full time Registered Nurse III ("RN III") beginning in December 2003. Brown was interviewed and hired by the Director of Nursing Services, Debbie Woirhaye ("Woirhaye"). At the time of her interview, Brown told Woirhaye that she was hearing impaired. According to Woirhaye, Brown answered questions and handled the interview process "very well.... No deficiencies or hearing deficits." Woirhaye made no further inquiry into Brown's hearing impairment.

Brown worked on Unit D which housed special care, dementia, or Alzheimer's patients. Unit D contains 50 beds. The Unit has a nurses' station at the center and two hallways extending at an angle in either direction. Each hallway is informally divided into three pods with the middle pod designated in part for dining and recreation. The majority of Brown's time was spent in the hallways dispensing medication and other patient care. Two staff members (whether RNs, certified medical technicians ("CMTs"), or certified nursing assistants ("CNAs")) were required to be physically present in each hallway at all times.

From the time of her hire in 2003 until approximately June of 2009, Brown worked with no complaints being made about her ability to do her job notwithstanding her hearing impairment. From 2003 until mid-December 2008, Brown's immediate supervisor was Michelle Lee ("Lee"). Lee knew Brown couldn't hear

"worth beans." Lee was aware that Brown developed "self-accommodations" to compensate for her hearing impairment. For example, when walkie-talkies were issued to nurses, Brown arranged to have her CMT carry the walkie-talkie, especially if Brown was the only nurse on duty on her unit. If another nurse was on duty, that nurse kept the walkie-talkie. Brown made sure the staff she worked with knew to speak to her face to face, as she was a skilled lip reader. Brown could generally hear that an overhead page had been made, but could not always understand everything, requiring her to ask another staff person to confirm the information communicated. Brown was unable to consistently hear on the telephone. She would have other nurses on duty take phone calls, or if no other nurse was on duty, would ask other staff to answer the phone. If the MVH doctor called with orders, Brown would have her CMT or CNA advise the doctor to hold while she sought out the House Supervisor (a registered nurse) to take the call. Though Brown could hear through her stethoscope, if she ever had reason to question her hearing of breath or bowel sounds, she would call the House Supervisor to give her a second opinion. If a patient's fall alarm[2] discharged, Brown could usually hear the alarm. However, staff knew Brown could not always hear the alarms and that they should respond, even if Brown was closer to a patient, if they could. Finally, when a patient would discharge a call light, Brown could generally hear the "ding" emitted, but could not always discern which room the sound was coming from. She would look for the blinking light above a patient's door to determine which patient needed assistance.

Prior to the fall of 2009, none of these self-accommodations were brought to the attention of either Woirhaye or Endsley. Lee indicated that while she was Brown's immediate supervisor, she never believed the self-accommodations to be a problem.

Desiree Atkins ("Atkins") became Brown's immediate supervisor after Lee left the position. In June 2009, after supervising Brown for approximately six months, Atkins expressed concern to Woirhaye regarding Brown's hearing impairment. Atkins reported that a patient's family member (who happened to be a retired nurse) had expressed concern about whether Brown could hear breath sounds through her stethoscope. This report did not concern Woirhaye because House Supervisors were always on duty to permit nurses to secure a second opinion about breath sounds-a routine practice. Woirhaye also knew that on the occasions when Brown had sought a second opinion about breath sounds, she was "always pretty accurate."

Several months later, Atkins reported to Woirhaye that she heard a patient's fall alarm sound and observed that Brown did not respond to the alarm. The patient was behind a wall and Brown had her back to that area. Brown did not hear the alarm. Atkins started "testing" Brown's hearing abilities by standing behind her and speaking to her to confirm that Brown could not hear. Atkins concluded that Brown could not hear unless someone was speaking to her from the front.

Woirhaye agreed that Atkins's concerns warranted further investigation. Woirhaye reported her intent to conduct an investigation to Endsley.

2. A fall alarm is an instrument attached to a patient who has been determined to be a fall risk, and is designed to alert medical staff to the patient's attempt to leave a bed, chair, or wheelchair.

Woirhaye and Atkins met with Brown in August 2009 and advised that they were concerned about whether Brown could perform the "essential functions" [3] of her position because of her hearing impairment.[4] Brown was candid about her inability to hear.

Woirhaye asked Atkins to further investigate. Atkins and a member of the personnel department met with staff who described the arrangements they had made with Brown to assist her in performing her duties notwithstanding her hearing impairment.

Woirhaye and Endsley were concerned with Brown's use of other staff to accommodate her hearing impairment. Brown was placed on administrative leave with pay beginning October 8, 2009. She was sent to an occupational and environmental specialist, Dr. Eddie Runde ("Dr. Runde"), to determine if she could perform the "essential functions" of her job with or without accommodations.

Dr. Runde assessed Brown's fitness and concluded that as long as reasonable accommodations are made, including an amplified stethoscope for breath sounds and bowel sounds and an amplified or text-based telephone, Brown should be able to continue to work safely for herself and the residents as an RN.

On November 2, 2009, Endsley, Woirhaye, and Atkins met with Brown. Woirhaye informed Brown that they would make the recommended accommodations of providing her with an amplified stethoscope and telephone. Brown was asked to sign a document reflecting a list of performance expectations as follows:

(1) responding to residents' personal safety alarms; (2) being able to hear breath and bowel sounds with amplified stethoscope; (3) communicating on the telephone with physicians, staff or families; (4) being on a rotation to be pulled to other units as needed; (5) be able to function as a house supervisor if needed; (6) carry and respond to walkie-talkie and respond appropriately; (7) be able to make rounds with physician and implement verbal orders via in person or on the telephone; and (8) be able to respond to emergency information by hearing the overhead page.

Brown refused to sign the document. She told management that she did not want to lie, and that she knew she could only perform some of the identified tasks with other accommodations, including her hearing aids and the continued assistance of staff, as had been her practice for years. As a result, Woirhaye recommended Brown's termination.

On November 24, 2009, a written notice of dismissal ("the Dismissal Letter") effective December 1, 2009 was hand-delivered to Brown. The Dismissal Letter, which was signed by Endsley, cited Brown's "inability to perform the essential functions of your job as a Registered Nurse III (RN III)" as the reason for her dismissal. The Dismissal Letter identified four "essential functions" that, according to MVH, Brown could not perform "by Brown's own admission:"

(1) hearing the residents' personal safety alarms or the nurse call light system; (2) hearing residents, significant others

---

3. The term "essential job junctions" was defined in MVH's internal ADA policy as "the fundamental job duties of the position the individual with a disability holds or desires that bear more than a marginal relationship to the job. A job function may be considered essential for any of several reasons, including but not limited to the fact that the reason the position exists is to perform that function."

4. No concern has ever been expressed about Brown's clinical abilities.

of residents, co-workers, physicians, and those Brown directly supervises unless they are directly in front of her; (3) hearing or subsequently responding to overhead pages that announce general and emergency information; and (4) hearing and subsequently responding to information over the two-way radios or walkie-talkies.

The Dismissal Letter stated:

Your inability to perform the essential job function of your job as a Registered Nurse III compromises the facility's ability to provide appropriate care to its residents. Additionally, your inability to perform the above tasks creates the potential for negative health care outcomes and has resulted in your co-workers and subordinates performing these job duties for you. Consequently, this additional work activity compromises the facility's ability to provide nursing care services to its residents. Thus this Dismissal is justified in the interest of efficient administration and that the good of the service will be served thereby.

Brown appealed her dismissal to the PAB.

The PAB agreed with MVH that the four job functions identified in the Dismissal Letter were "essential functions" as defined by MVH internal policy.[5] The PAB concluded, however, that MVH failed to sustain its burden to establish grounds for Brown's dismissal. The PAB ordered that Brown be reinstated and awarded her back pay.

MVH filed a petition for judicial review with the trial court. After a hearing, the trial court entered judgment affirming the PAB's decision. This appeal followed.

## Standard of Review

On an appeal from a judgment of a trial court addressing the decision of an admin-istrative agency, we review the decision of the administrative agency and not the judgment of the trial court. *Bird v. Mo. Bd. of Architects*, 259 S.W.3d 516, 520 n. 7 (Mo. banc 2008). Notwithstanding, in our mandate, we reverse, affirm or otherwise act upon the judgment of the trial court. *Id.*

"Pursuant to Mo. Const. art. V, section 18 and section 536.140, [ ] we must deter-mine 'whether the agency's findings are supported by competent and substantial evidence on the record as a whole; whether the decision is arbitrary, capri-cious, unreasonable or involves an abuse of discretion; or whether the decision is unauthorized by law.'" *Henry v. Mo. Dept. of Mental Health*, 351 S.W.3d 707, 712 (Mo.App. W.D.2011) (quoting *Coffer v. Wasson–Hunt*, 281 S.W.3d 308, 310 (Mo. banc 2009)).

"[A] court reviewing the actions of an administrative agency should make a 'sin-gle determination whether, considering the whole record, there is sufficient competent and substantial evidence to support the award.'" *Albanna v. State Bd. of Regis-tration for Healing Arts*, 293 S.W.3d 423, 428 (Mo. banc 2009) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003)). Though we "consid-er[ ] the entire record to determine wheth-er the decision is supported by competent and substantial evidence, ... '[w]e may not substitute our judgment on the evi-dence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credi-bility of witnesses.'" *Henry*, 351 S.W.3d at 712 (quoting *Stacy v. Harris*, 321 S.W.3d 388, 393–94 (Mo.App. S.D.2010)). "We 'must look to the whole record in reviewing the Board's decision, not merely at that evidence that supports its decision,'

5. See footnote 3.

*and we no longer view the evidence in the light most favorable to the agency's decision." Id.* (quoting *Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 791 (Mo. banc 2004) (emphasis added)).

When an administrative agency decision is based on the agency's interpretation and application of the law, we review the administrative agency's conclusions of law and its decision *de novo. Algonquin Golf Club v. State Tax Comm'n*, 220 S.W.3d 415, 418 (Mo.App. E.D.2007).

## Analysis

MVH raises two points on appeal. First, MVH argues that the PAB's Decision is unauthorized by law because it declares the use of other staff to be a reasonable accommodation in violation of MVH's internal policy and the ADA. Second, MVH argues the PAB erroneously failed to uphold Brown's dismissal and that the PAB's Decision is not supported by competent and substantial evidence, and is arbitrary and unreasonable, and constitutes an abuse of discretion. We address these points out of order, as our logical starting point is the extent to which the PAB's reversal of Brown's dismissal is supported by the record as a whole.

## Point II

 Chapter 36[6] is "The State Personnel Law (Merit System)" which establishes a system of personnel administration based on merit principles for a variety of State departments, including the Missouri Veterans Commission. Section 36.030. MVH is maintained by the Missouri Veter-

ans Commission, rendering Brown a merit employee.

Pursuant to section 36.380, "[a]n appointing authority[7] may dismiss for *cause* any employee in his division occupying a position subject hereto when he considers that such action is required in the interests of efficient administration and that the *good of the service* will be served thereby." (Emphasis added.)

> 'For cause' means legal cause. It 'must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public.'

*Prenger v. Moody*, 845 S.W.2d 68, 77 (Mo. App. W.D.1992) (quoting *McCallister v. Priest*, 422 S.W.2d 650, 657 (Mo. banc 1968)). 1 CSR 20–3.070(2) sets forth a non-exhaustive list of circumstances that are sufficient to establish "cause" for dismissal. *Black v. Lombardi*, 970 S.W.2d 378, 381 (Mo.App. E.D.1998). Subsection E permits dismissal for cause where a merit employee:

> Has some permanent or chronic physical or mental ailment or defect which incapacitates him/her for the proper performance of the duties of his/her position[.]

 For the good of the service is not defined by Missouri Statutes, but "implies some personal misconduct or fact that renders the employee's further employment harmful to the public interest.'" *Mo. Veterans' Comm'n v. Vanderhook*, 290 S.W.3d 115, 119 (Mo.App. W.D.2009) (quoting *Lombardi v. Dunlap*, 103 S.W.3d 786, 791 (Mo.App. W.D.2003)). " 'The standard further requires a decision by the appointing

---

**6.** All statutory references are to RSMo 2000 as supplemented unless otherwise indicated.

**7.** "Appointing authority" is defined as "an officer or agency subject to [Chapter 36] hav-

ing power to make appointments." Section 36.020.2. In this case, the appointing authority is Endsley.

authority that the employee's conduct is of such a serious nature that dismissal is required rather than some other form of discipline.' " *Id.* (quoting *Lombardi*, 103 S.W.3d at 791).

■■■ "For the good of the service" is not synonymous with "for cause," although the two concepts will usually overlap. *Bowen v. Mo. Dep't of Conservation*, 46 S.W.3d 1, 9–10 (Mo.App. W.D.2001).

> Section 36.380 thus provides that, in order to terminate a merit employee, an appointing authority must first have *cause* to do so. The statute then provides a second tier of inquiry for the appointing authority, stating that before deciding to dismiss the merit employee for cause, the appointing authorities must consider whether dismissal is in the interests of efficient administration *and* whether the *good of the service* will be served thereby. . . . It is true that, in the case of merit employees, courts have often combined their inquiry into whether a firing was for cause with whether it was for the good of the service, and it is not surprising that it would often be for the good of the service to terminate an employee who had given cause to do so.

*Id.* at 10 (citation and quotation marks omitted) (emphasis added). Section 36.380 thus requires "cause" to be demonstrated in every case. However, cause alone will not support termination of a merit employee unless termination is also for the good of the service.

> For instance, [the Department] could determine that the employee is essential to the Department's function, or that the employee's departure would have severe effects on morale, or that no reasonable substitute is available, or more subjective factors such as the employee's history and motivation may cause the De-

partment to decide that termination is not the proper remedy.

*Bowen*, 46 S.W.3d at 11. "The burden of proof is on the employing agency to establish grounds for dismissal." *Vanderhook*, 290 S.W.3d at 119 (citing *Missouri Veterans Home v. Bohrer*, 849 S.W.2d 77, 78 (Mo.App. W.D.1993)).

Here, the PAB found that MVH did not sustain its burden to establish grounds for Brown's dismissal. Specifically, the PAB found:

> The Appointing Authority has failed in his burden of proof that [Brown's] dismissal was for the good of the service in that he has not shown that [Brown] had some permanent or chronic physical or mental ailment or defect which incapacitates her from the proper performance of her duties.

Though the PAB characterized its finding in terms of the "good of the service" prong, in fact the specific standard articulated by the PAB is the example of "cause" set forth at 1 CSR 20–3.070(2)(E). We must determine, therefore, whether sufficient competent and substantial evidence exists on the record as a whole to support the PAB's finding.

In making its determination, the PAB considered MVH's written internal policies. Internal policy Section B–2, MVH's ADA policy ("ADA Policy"), provides in part:

> Unless such action would result in an undue hardship to the MVH, the MVH will offer a reasonable accommodation to a qualified individual with a disability so that individual can perform the essential job functions.[8]
>
> . . . .
>
> An individual who can be reasonably accommodated for a job, without undue

---

**8.** *See* footnote 3 for MVH's definition of "essential job functions."

hardship, will be given the same consideration for that position as any other applicant.

. . . .

All employees are required to comply with safety standards. . . . Current employees who pose a direct threat to the health or safety of other individuals in the workplace will be placed on appropriate leave until an organizational decision has been made in regard to the employee's immediate employment situation. It is the obligation of the . . . employee to make an affirmative request for an accommodation.

. . . .

"[D]irect threat to safety" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.

. . . .

"Reasonable accommodation" means making reasonable modifications or adjustments to be determined on a case-by-case basis that are designed to enable a qualified individual with a disability to be hired or to remain in the position for which he or she was hired. Forms of accommodation may include but, depending on the circumstances, do not necessarily include, the following:

1) Making existing facilities readily accessible to and usable by individuals with disabilities;

2) Job restructuring;

3) Part time or modified work schedules;

4) Reassignment to a vacant position;

5) Acquisition or modification of equipment or devices;

6) Adjustment or modification of examinations;

7) Adjustment or modification of training materials;

8) Adjustment or modification of policies; and

9) Similar activities.

MVH's ADA Policy thus anticipates that disabled persons will be reasonably accommodated; that reasonable accommodations will be determined on a case-by-case basis "designed to enable the disabled person to stay in the position"; that all reasonable accommodations will be afforded "unless to do so would result in an undue hardship"; and that a reasonably accommodated employee who poses a "significant risk to the health or safety of others" will be subject to termination.

As previously noted, the PAB found that the "essential functions" identified in Brown's Dismissal Letter were, in fact, essential functions of her job as defined in MVH's ADA Policy.[9] These "essential functions" were: (1) hearing the fall alarms and the nurse call alarms; (2) hearing residents, significant others of residents, co-workers, physicians, and those Brown directly supervises; (3) hearing overhead pages; and (4) hearing and subsequently responding to information over the two-way radios or walkie-talkies.

The PAB found that any inability to hear the fall alarms was not an issue as the use of fall alarms was being discontinued by MVH. In addition, the PAB found that CMTs and CNAs are generally the first responders to fall alarms, and that it is thus not an unreasonable accommodation (i.e. not an accommodation that causes MVH undue hardship) to have the CMTs or CNAs designated as the first responders when working with Brown. As the PAB observed, the evidence indicated this

---

9. In considering MVH's ADA Policy, the PAB did not determine (and was not required to determine, as we discuss in greater detail, *infra*), whether the policy complies with the ADA.

had been the practice for over five years with no adverse result, reflecting no direct threat to safety.

Similarly, the PAB found that it was not an unreasonable accommodation to have a CMT or CNA carry the walkie-talkie and translate messages for Brown, or to inform her of the contents of an overhead page. The PAB again observed that had been the practice for over five years without incident, and that there was no evidence that the practice was unduly burdensome or did not work effectively. The PAB observed that there was no evidence that Brown ever failed to respond appropriately to information provided via walkie-talkie or overhead page. The PAB concluded that MVH's concern that "some set of circumstances could occur that would cause an adverse result because of this accommodation was speculation."

The PAB found that "it does not appear to be unduly burdensome or have caused any problems for staff to speak to [Brown] face to face so she can be assured of understanding what they are saying to her." As with Brown's other self-accommodations, this had been the practice between Brown and staff for five years without incident. Even where a resident was trying to talk to Brown while behind her, the PAB did not believe it an unreasonable accommodation for Brown to rely on staff to bring that to her attention. Finally, the PAB concluded that there was no evidence that Brown and the MVH doctor were not effectively communicating during rounds.

The PAB found "that [Brown's] self-accommodations regarding walkie-talkies, the overhead page, and having staff, co-workers and family talk to her face to face and let her know when a resident is talking to her ... are reasonable accommodations, and with them [Brown] can perform all the essential functions of her position as a ward charge nurse with the MVH." The PAB correspondingly concluded that MVH failed to establish "cause" for Brown's termination in that it failed to establish that Brown had "some permanent or chronic physical or mental ailment or defect which incapacitates her from the proper performance of her duties."

The PAB's decision was supported by sufficient competent and substantial evidence.

At the hearing, the parties stipulated that Brown had never been disciplined for failure to perform the essential functions of her job; that Brown never had anything below a successful performance appraisal; and that no performance appraisal reflects that Brown had any communications problems.

Endsley testified that the fall alarms were being removed from service, and were not being replaced with another alarm system but instead with "consistent staffing."

Atkins confirmed that the fall alarms had been eliminated from Brown's former unit. Atkins testified that she had no problem communicating with Brown as long as she was looking at her, that doing so was not a problem for her. Atkins was unaware of any problems that had resulted from the practice of a CMT carrying Brown's walkie-talkie. Atkins had never received a complaint from a physician regarding communications with Brown.

Lee, Brown's supervisor prior to Atkins, testified that in the five years she was employed at MVH, she did not recall receiving any complaints or concerns about Brown from any staff member or family member of a resident. Lee did not recall any problems with falls due to Brown's hearing impairment and was absolutely satisfied with Brown's performance. Lee stated that if Brown had her back to her she would tap her on the shoulder like she

would do for anyone else. Lee stated that there were no communication issues when Brown was facing her. Lee added that none of the doctors had ever complained about Brown's communication abilities. Lee testified that CNAs are primarily responsible for responding to alarms and call lights as part of their job because Brown, nor any other nurse, could be everywhere at all times. Lee testified that "the CNAs responsibility is to [be] the eyes and ears period. That's part of their training. . . . [I]t doesn't matter whether she's hearing impaired or not impaired that's their job period." Lee testified that she had no concerns about Brown using the CMT to carry her walkie-talkie.

John Sharpe ("Sharpe"), an RN and another supervisor of Brown's, testified that when an alarm did go off, the policy was for the closest person to respond. Sharpe testified that he never had any concern about resident safety due to Brown's hearing impairment. Sharpe testified that five CNAs usually worked on Brown's shift, and that all of the staff worked as a team. Sharpe testified that Brown used the team as he would expect, and that communication is the key for Brown or any nurse to know what is going on. Sharpe also testified that there had been a reduction in overhead paging. Sharpe had no issue with the fact that Brown did not use the walkie-talkie. Sharpe testified that he does not have a hearing impairment but has a problem with the walkie-talkies because they "garble a lot and I'm continually asking for-you know, come again; tell it to me again." Sharpe testified that Brown usually had the same CMT carry the walkie-talkie and that he had no problems communicating with Brown through the CMT.

Alice Stucker ("Stucker") testified that she met Brown when her husband was admitted to Unit D at the MVH and had no concerns about communicating with Brown, or with Brown's interactions with her husband. Stucker said she knew a lot of family members of other residents and had never heard any concerns about Brown.

Teresa Darnell ("Darnell"), an RN and supervisor of Brown at MVH, testified that when Brown was hired, she was told that Brown wore hearing aids and that Brown "sometimes needed to look at you if your tone of voice was not high enough." Darnell stated she never noticed any times when Brown could not hear her and stated "I just always made sure that I wasn't behind her." But, she also stated that when she conversed with Brown behind her back that Brown would answer her. Darnell stated the only things communicated on the walkie-talkies were requests to call an extension or a request for someone to respond to an area. If a significant situation arose, Darnell would not use the walkie-talkie but would go directly to the unit. No one raised any concern with her about Brown's hearing impairment affecting her abilities. No issues ever resulted from Brown's communicating through the CMT on the walkie-talkie. Darnell did not consider it a burden to walk to the unit to talk directly with Brown.

Cassie Bradford ("Bradford"), a CNA for MVH, testified that she worked with Brown. Bradford testified that responding to fall alarms was part of her job. Bradford stated in some instances an alarm would go off and she would respond when she knew Brown could not hear it even though Brown was closer in proximity to the sounding alarm. She did this without instruction because her job description required her to respond to alarms.

Brown testified that she informed all of her co-workers that she was hearing impaired and that she would not be able to hear them from down the hall. Brown

stated that she informed the families of the residents that due to her hearing impairment, she would talk to them on the telephone through an interpreter. Brown stated that CNAs with whom she worked knew to bring her information directly and that she usually worked with the same CMT who understood that she was to carry the walkie-talkie and to come get Brown if there were any announcements that Brown might not have heard.

Brown testified that the overhead pages were never any difficulty for her as they were used only in emergencies. She could hear when an overhead page was occurring, and thus knew an emergency was occurring, permitting her to quickly find out what was going on. Brown stated that she relies on lip reading for a large portion of her communication skills. Brown testified that walkie-talkies were not used when she began her employment, and when they started being used a few years later, she let all those around her, including unit supervisors, nurses, staff, CNAs, and CMTs, know that she could not understand communications via walkie-talkie, and that someone else would have to carry her walkie-talkie and advise her when a response was needed. Brown stated that she was never told that it was a problem that she was not carrying the walkie-talkie.

Finally, Dr. Runde's report, generated at the request of MVH, concluded that so long as Brown received accommodations in the form of an amplified stethoscope and telephone, she should be able to perform her essential job functions, and to work safely for herself and the residents.

In summary, sufficient competent and substantial evidence supports the PAB's conclusion that Brown could perform the essential functions of her job with reasonable accommodations, defined by MVH's ADA Policy as accommodations determined on a case-by-case basis that enable a qualified individual with a disability to remain in the position for which she was hired. Further, sufficient competent and substantial evidence supports a conclusion that the self-accommodations developed by Brown did not result in an undue hardship to MVH.

■ Even assuming Brown's self-accommodations were reasonable as defined by MVH's ADA Policy, MVH claims that the PAB erroneously concluded that Brown's self-accommodations did not create a "direct threat to safety" permitting MVH to terminate Brown for cause. MVH argues that the use of other staff as a reasonable accommodation created the potential for negative health care outcomes and threatened the safety of staff and residents.

To support its position, MVH argues that Brown admitted an inability to perform the essential job functions identified in her Dismissal Letter, and points out that the self-accommodations being used by Brown were unknown to Woirhaye and Endsley during Brown's first five years of employment. This, according to MVH, explains why Woirhaye and Endsley did not earlier proclaim concern that Brown's self-accommodations constituted a direct threat to safety.

MVH's argument ignores Brown's testimony that when she admitted to an inability to perform certain essential functions of her job, she meant *without* accommodations. Brown testified that she did not sign the job expectations letter presented to her during one of her meetings with management because she believed she was being asked to commit to perform those job functions without the self-accommodations she had been successfully employing for years. MVH's documentation of the meetings held with Brown confirms that this explanation for not signing the job

expectations letter was, in fact, conveyed by Brown.

Moreover, the PAB's finding that it was reasonable to continue to permit Brown to employ self-accommodations she had been relying upon for five years was not inconsistent with its finding that Woirhaye and Endsley were unaware of the self-accommodations during that time. The conclusion that Brown should be permitted to use self-accommodations that had been successfully employed for five years simply supported the PAB's belief that the self-accommodations were not an undue hardship on the MVH, and did not pose a direct threat to safety. This conclusion could be reached (and was reached) independent of upper management's awareness of the self-accommodations. The PAB did not indict MVH's administration for its failure to be aware of the self-accommodations any sooner, or Brown for her failure to seek management approval of the self-accommodations. Rather, the fact that Endsley and Woirhaye remained unaware of the self-accommodations for five years was referenced by the PAB in support of its conclusion that the self-accommodations were not unreasonable, did not create an undue hardship, and were not a direct threat to safety, as one would otherwise have expected frequent and earlier complaints about Brown's job performance.

MVH also argues that the PAB erroneously concluded that the fear "some set of circumstances could occur that would cause an *adverse* result because of [the self-accommodations] was *speculation.*" (Emphasis added.) MVH claims that the terms "adverse" and "speculation" impermissibly create a new legal standard which requires MVH to wait until a safety incident occurs before an employee can be terminated. We disagree.

There is a wide crevice between speculating about something that might occur in the universe of hypothetical possibilities, and presenting evidence sufficient to permit a conclusion that there is reasonable possibility of an event occurring in the future. The definition of "direct threat to safety" employed by MVH in its ADA Policy requires proof of "a significant risk." To demonstrate "a significant risk" it is self-evident that MVH must do more than be able to articulate, in the abstract, what could happen in the hypothetical. By requiring more than rank speculation about a threat to safety, the PAB did not impose a legal requirement that a safety incident must first occur before an employee with a disability could be terminated by MVH.

We are mindful that in terminating Brown, MVH has attempted to avoid the risk of exposure to liability should a resident claim that the care afforded by Brown fell below the standard of care due to her hearing impairment. However, MVH's ADA Policy sets forth a balance between this desire and the retention of disabled employees by requiring a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodations." Beyond the hypothetical concern expressed by MVH in this case, there is simply no evidence that Brown's reliance on staff creates a "significant risk" to health or safety. In fact, were we to accept MVH's construction of its ADA Policy, and its description of the essential job functions of an RN, it is difficult to envision how any hearing impaired person could ever be employed at MVH.

Sufficient competent and substantial evidence supports the PAB's conclusion that any "direct threat," if any, posed by Brown's hearing impairment was addressed by reasonable accommodations, including reliance on other staff to assist

Brown in the performance of the essential functions of her job.

Point II is denied.

### Point I

■ For its first point, MVH claims that the PAB's Decision is unauthorized by law in that it declares the use of other staff a reasonable accommodation for a disability contrary to MVH's ADA Policy and case law interpreting the American with Disabilities Act (the "ADA").

The first part of this point argues that the PAB's conclusion is legally erroneous in light of the definition of "reasonable accommodations" in MVH's ADA Policy. Though MVH argues that self-accommodations that rely on the assistance of other staff are *per se* unreasonable, its ADA Policy does not support this legal conclusion. The definition of "reasonable accommodations" sets forth a non-exhaustive list, and emphasizes the objective of affording *all* accommodations (absent the imposition of an undue hardship) that will permit a disabled individual to retain a position for which they were hired. The definition does not exclude from its parameters any specific accommodation, and certainly does not exclude the "reliance on other staff." The PAB did not commit legal error, therefore, in construing MVH's ADA Policy to permit reliance on other staff as a reasonable accommodation when, employing a case-by-case analysis, that conclusion is supported by the evidence.

■ The second part of MVH's point complains that the PAB committed legal error because the ADA does not permit reliance on other staff to perform the essential functions of a job as a reasonable accommodation. We express no opinion about the accuracy of MVH's claim. This was not an ADA case.[10] The premise in-

herent in MVH's argument is thus flawed. No authority offered to us by MVH suggests that in determining whether Brown was terminated for cause and for the good of the service, the PAB was required to reach the same result as would have been reached had Brown filed an ADA discrimination case. In fact, the opposite is true. As the PAB properly noted in its Decision, it had no authority to entertain or determine an ADA case. As a creature of statute, the PAB has only those powers expressly conferred on it or necessarily implied by Missouri Constitution or statute. *Bodenhausen v. Mo. Bd. of Registration for the Healing Arts*, 900 S.W.2d 621, 622 (Mo. banc.1995). The PAB's statutory powers did not extend to deciding claims for violations of a federal statute.

MVH's argues that although the PAB could not determine whether its termination of Brown violated the ADA, the PAB was nonetheless bound to interpret the meaning of terms and phrases used in MVH's ADA Policy consistent with federal cases construing the same terms in the context of an ADA claim. We disagree. MVH's argument ignores that its ADA Policy included definitions for the "legal" terms therein employed. To the extent MVH's ADA Policy provided greater rights to disabled workers than the ADA, the PAB was neither required, nor empowered, to rewrite MVH's definitions to comport with federal case law construing the ADA.

The PAB determined whether cause and for the good of the service had been established sufficient to permit termination of a merit employee under Chapter 36. Whether Brown's termination might otherwise have been permissible under the ADA was not decisive of this question.

Point one is denied.

10. Both parties improvidently characterized Brown's claim of improper dismissal as, essentially, a claim for discrimination under the ADA before the PAB and on this appeal.

**Conclusion**

We affirm the trial court's judgment affirming the Decision of the PAB.

All concur.