

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

ELLIS McSWAIN, APPOINTING )
AUTHORITY, and THE BOARD OF )
PROBATION AND PAROLE, MISSOURI )
DEPARTMENT OF CORRECTIONS, )
                    )
             **Respondents,** )
                    )
**v.**                     )
                    )
                    )
CLETUS ANDREW MORTON, )
                    )
               **Appellant.** )

WD77651

OPINION FILED:
**December 23, 2014**

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Patricia S. Joyce, Judge**

**Before Division Three:** Karen King Mitchell, Presiding Judge, and
Cynthia L. Martin and Gary D. Witt, Judges

Cletus Morton appeals the decision of the Circuit Court of Cole County, reversing the determination of the Administrative Hearing Commission (AHC) that Ellis McSwain, the appointing authority for the Division of Probation and Parole (Division), did not have cause to dismiss Morton from employment. We affirm the circuit court's judgment.

## Facts

The Division, organized within the Department of Corrections (Department), is overseen by the Board of Probation and Parole. Ellis McSwain is both the chairman of the Board and the appointing authority. At the time of his termination, Cletus Morton was a Probation and Parole Officer II at the Division's 10-R District Office in Springfield, Missouri.

Morton's job duties consisted of ensuring that felony probationers and parolees complied with the law, counseling probationers regarding their personal and adjustment problems, advising the courts regarding potential probation revocation, and working in conjunction with local law enforcement.

On the evening of October 8, 2010, Morton was watching his seven-year-old daughter when he consumed between one-half and three-quarters of a 750 ML bottle of vodka. Morton's behavior around his daughter caused her to call her mother, Morton's ex-wife, and ask to be picked up because she did not want to stay with Morton. Mother picked up their daughter, and as she was backing her car out of the driveway, Morton emerged from the home with a .40 caliber Glock handgun. In full view of his daughter, Morton fired two shots at his head, in an apparent suicide attempt. One shot missed his head completely and hit the roof of his home. The second shot grazed Morton's face and also hit the roof. Neither round was recovered, and either or both may have gone through the roof and into the neighborhood.

After firing the shots and still in possession of his loaded firearm, Morton went back into the house and locked himself in a closet. While Morton was locked in the closet, Greene County police surrounded his home, formed a defensive perimeter, and blocked a portion of the street. When the police knocked on the door, Morton did not respond. While in the closet, Morton phoned his girlfriend and told her that he would kill himself if the police entered his house.

2

Eventually, Morton called the police and indicated that he would surrender. As Morton exited the house, the police formed a four-man arrest team: one officer was armed with a taser, one had his service weapon, a third was on the ground nearby with an AR-15 rifle, and a fourth officer placed Morton under arrest. Morton was charged with unlawful use of a weapon, a class D felony. The charge, however, was subsequently dismissed.

Following his arrest, Morton was involuntarily committed for a 96-hour mental health evaluation. On October 12, 2010, Morton was placed on administrative leave. The District Administrator for the Division, Bill Abbett, investigated the incident and met with Morton. During the investigation, three employees approached Abbett with concerns involving safety should Morton return to work. Morton attended substance abuse counseling during his administrative leave and through the date of the hearing.

After the investigation was complete, McSwain received the investigative packet, including a written statement from Morton. After considering the circumstances surrounding the incident, as well as Morton's fourteen-year career with the Division, McSwain determined that termination of Morton's employment was necessary for the good of the service. On April 7, 2011, McSwain gave Morton a letter, terminating his employment as of April 29, 2011. The letter set forth the following grounds for dismissal:

> On or about October 8, 2010, Greene County Police Officers were dispatched to your home based on a 911 call from your ex-wife. She reported that you were intoxicated and had fired two rounds from a Glock pistol. Reports indicated that you made threats to take your own life. You barricaded yourself within your house and threatened to shoot if officers forced their way in. Following an extended period of negotiation with the police, you exited your residence and were taken into custody. While in custody, you stated "My goal tonight was to kill myself and I'm so fucked up that I can't even do it."
>
> In a written statement you provided to District Administrator Bill Abbett, you admitted that on the evening of October 8, 2010, you became very intoxicated. You then exited your residence to the front porch and fired two rounds into the

3

house with your handgun that you are certified to carry as a Probation and Parole Officer.

Your actions were inappropriate, unprofessional and in violation of the following Missouri Department of Corrections Policies and Procedures:

 D2-16.1 Firearms—Probation and Parole, Section III-B-9, which states: "An employee will not carry a firearm within eight hours of consuming alcoholic beverages and at any time if under the influence of an alcoholic beverage."

 D2-11 Employee Standards, Section I, which states: "All employees of the Department of Corrections are expected to maintain professionalism during the performance of their duties, and in their relationship with the public, fellow employees, and offenders. The manner with which an employee conducts their personal life should also display the highest professional standard and should not reflect negatively upon the Department."

 D2-11.10 Staff Conduct, Section III-A-12 states: "Staff are expected to represent to the public the highest moral, ethical and professional standards and must accept as a condition of employment a code of personal conduct beyond that of a staff member in the private sector or some other public sector positions."

Based on your actions as described herein, your level of professionalism has been brought to question and I can no longer trust you to perform your duties. Your dismissal is necessary for the good of the service and is required in the interest of the efficient administration of the Board of Probation and Parole.

Morton appealed the dismissal to the AHC. Morton testified at the hearing. He did not dispute any of the factual assertions contained in the dismissal letter, and his description of the events of the night in question were largely consistent with the letter. Morton added that he had been depressed and drinking all day on the date of the incident, that he was suicidal, and that he was not having "clear thoughts." Morton also testified that, following the incident, he received 21 days of in-patient alcohol treatment, attended "AA meetings," and received psychological counseling every two weeks.

Following the hearing, the AHC found that there was not cause for the dismissal. While the AHC found that Morton had violated the policies referenced in the termination letter, it reasoned that, at the time of the incident, Morton "was both intoxicated and suffering from depression" and was not "having clear thoughts." Thus, Morton had not "willfully," violated the policies, as required for dismissal under 1 C.S.R. § 20-3.070(2)(L),[1] which provides that there is cause for "dismissal of any employee in the classified service . . . [when] the employee . . . [h]as *willfully* violated the lawful policies of the agency." (Emphasis added.)

McSwain appealed to the Circuit Court of Cole County. Following a hearing, the court overturned the AHC, holding that its decision was "arbitrary, capricious and unreasonable; unsupported by the competent and substantial evidence on the whole record; involved an abuse of discretion; and misapplied the law to the facts of the case."

Morton timely appealed. McSwain, as the party aggrieved by the AHC's decision, filed the appellant's brief and reply brief. Rule 84.05(e).

## Standard of Review

"On an appeal from the trial court's review of an AHC decision, we review the decision of the AHC, not the judgment of the trial court." *Dep't of Soc. Servs. v. Peace of Mind Adult Day Care Ctr.*, 377 S.W.3d 631, 637 (Mo. App. W.D. 2012). "'The AHC's decision will be upheld unless it is not supported by competent and substantial evidence upon the whole record; it is arbitrary, capricious, or unreasonable; it is an abuse of discretion; or it is otherwise unauthorized by law or in violation of constitutional provisions.'" *Id.* (quoting *Beverly Enters.-Mo. Inc. v. Dep't of Soc. Servs.*, 349 S.W.3d 337, 351 (Mo. App. W.D. 2009)). In determining whether a decision is supported by competent and substantial evidence, we review the record as a whole and determine whether the AHC's decision is against the overwhelming

---

[1] All regulatory citations are to the Missouri Code of State Regulations, as updated.

weight of the evidence. *Id.* (citing *Albanna v. State Bd. of Registration for the Healing Arts*, 293 S.W.3d 423, 428 (Mo. banc 2009)). Though we do not view the AHC's factual findings in the light most favorable to the decision, "we still must defer to its credibility findings, as the AHC is the sole judge of the credibility of witnesses and the weight and value to give to the evidence." *Id.* (internal quotation omitted). "We review the AHC's conclusions on the interpretation and application of the law *de novo.*" *Id.*

## Analysis

McSwain raises three points on appeal. In his first point, McSwain argues that the AHC erred in finding that the Division lacked cause to dismiss Morton because he did not willfully violate state regulations and Department policies. In his second point, McSwain argues that the AHC erred in overruling Morton's dismissal because there was competent and substantial evidence that the dismissal was for the good of the service. In point three, McSwain argues that, even if Morton did not act willfully, other merit system regulations provide grounds for the dismissal without requiring a finding of willfulness. McSwain's second and third points require that we reverse the AHC; thus we do not reach his first point.

"An appointing authority may dismiss for cause any employee in his division occupying a position subject hereto when he considers that such action is required in the interests of efficient administration and that the good of the service will be served thereby." § 36.380.[2] "Section 36.380 thus provides that, in order to terminate a merit employee, an appointing authority must first have *cause* to do so." *Bowen v. Mo. Dep't of Conservation*, 46 S.W.3d 1, 10 (Mo. App. W.D. 2001). "The statute then provides a second tier of inquiry for the appointing authority, stating that before deciding to dismiss the merit employee for cause, the appointing

---

[2] All statutory references are to the Revised Statutes of Missouri 2000, as updated through the 2011 Cumulative Supplement, unless otherwise noted.

6

authorities must consider whether dismissal is in the interests of efficient administration *and* whether 'the *good of the service* will be served thereby.'" *Id.* (quoting § 36.380 and adding emphasis).

Thus, we begin our analysis with McSwain's third point, addressing whether he had cause to dismiss Morton. We then turn to his second point, arguing that the dismissal was for the good of the service.

## I.      There was cause to dismiss Morton.

"'For cause' means legal cause." *Mo. Veterans Home v. Brown*, 374 S.W.3d 359, 365 (Mo. App. W.D. 2012) (internal citations and quotations omitted). "It 'must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public.'" *Id.* (quoting *Prenger v. Moody*, 845 S.W.2d 68, 77 (Mo. App. W.D. 1992)).

The AHC believed that "in order to decide this case in McSwain's favor, we must find that Morton acted *willfully*." (Emphasis added.) Presumably, the AHC believed that 1 C.S.R. § 20-3.070(2)(L), providing that cause for dismissal exists when the employee "[h]as willfully violated" agency policy, controls. It is unclear why the AHC believed that McSwain was limited to this specific subsection of the state regulations in defending the dismissal.[3] "1 CSR 20-3.070(2) sets forth a non-exhaustive[4] list of circumstances that are sufficient to establish

---

[3] As is addressed in more detail *infra*, in the dismissal letter, McSwain identified multiple Department policies that Morton's conduct violated. The letter was not required to and did not include citation to any specific rules in the Code of State Regulations as providing grounds for the dismissal.

[4] Dismissal "may be based upon causes other than those enumerated in this rule." 1 C.S.R. § 20-3.070(2). Despite noting in the argument section of his brief that "the list of causes for discipline in the [rule] are non-exhaustive," McSwain does not raise in his point relied on, or develop in the argument section of his brief, the argument that Morton's conduct provides sufficient cause for dismissal for reasons not specifically enumerated. Rather, McSwain argues that subsections (E) and (H) of the rule provide grounds for dismissal. Thus, we will limit our analysis to whether Morton's conduct falls within 1 C.S.R. § 20-3.070(2)(E) or (H). The Court will not consider arguments "not contained in the . . . appellant's brief or in any of its points relied on." *Salvation Army, Kan. v. Bank of Am.*, 435 S.W.3d 661, 670 (Mo. App. W.D. 2014).

7

'cause' for dismissal." *Brown*, 374 S.W.3d at 365. Nothing within the rule suggests that the categories are exclusive of each other, and one can, with little difficulty, imagine instances in which specific conduct can provide cause under a number of different provisions.[5] And in the present case, the conduct enumerated in the letter of dismissal sets forth grounds for dismissal that fall within at least one of the rule's subsections.

McSwain argues that cause exists for the dismissal under 1 C.S.R. § 20-3.070(2)(H),[6] which provides that there is "cause[] for suspension, demotion, or dismissal of any employee" when the employee "[h]as been guilty of a scandalous and disgraceful conduct while on or off duty where this conduct tends to bring the state service into public disrepute or has exhibited behavior which adversely affects the employee's job performance, the employing agency, or both."

Morton's conduct plainly falls within the scope of this provision. Probation and Parole officers, as Morton testified, have the duty to monitor offenders residing within the public at large in order "to make sure that they [are] not a risk to public safety." The public has the right to expect that the agency entrusted with monitoring these potentially dangerous offenders will employ individuals who handle themselves with the highest degree of professionalism. And the

---

[5] For example, a Department employee who shows up to work intoxicated and engages in a violent rampage could potentially fall under no fewer than eight subsections: 1 C.S.R. § 20-3.070(2)(C) (wantonly careless or negligent in the care of the property of the state); (G) (conviction of any felony); (H) (behavior which adversely affects the employing agency); (I) (abusive or improper treatment of guests or clients while on duty at any state facility); (K) (failure to respond in a reasonable manner to instructions of superiors); (L) (willfully violating the policies of the agency); (M) (abusive or physically violent toward other employees); and (N) (intoxicated or under the influence of a controlled substance while on duty).

[6] Noting the AHC's finding that Morton is "a chronic alcoholic," McSwain also argues that 1 C.S.R. § 20-3.070(2)(E), involving an employee with a "permanent or chronic physical or mental ailment or defect which incapacitates him[] from the proper performance of [his] duties . . . including unrehabilitated alcoholism or narcotics addiction," provides grounds for dismissal. McSwain affirmatively waived this argument at the hearing when objecting to evidence of Morton's subsequent treatment: "We're not alleging that . . . [Morton is] not capable of performing the essential functions of his job because of his medical condition. What we alleged is that he engaged in specific [conduct] that evening." While we disagree with Morton that this statement waives all arguments that Morton cannot effectively perform his job *as a result of* the conduct that night, we agree that McSwain has waived any argument that a "physical or mental ailment or defect" keeps Morton from performing his duties.

8

Department and Division have the right to expect that same degree of professionalism from Probation and Parole officers. *Lowe v. Lombardi*, 957 S.W.2d 808, 812 (Mo. App. W.D. 1997) ("Given the hostile, volatile environment in which the [Department of Corrections] must operate, it has a right to expect its officers to comply fully with its directives."). When an employee's conduct falls below this standard, it threatens to undermine the credibility of other Probation and Parole officers, as well as the Department and Division as a whole, with the public, with other law enforcement personnel, among offenders, and within the courts. And conduct such as Morton's—drunkenly brandishing a firearm and, with wanton recklessness, firing it multiple times in the air in a residential neighborhood, endangering the lives of the very public he is charged with protecting—harms the Division's reputation and falls well below the standard that the Division has the right to expect from its employees. *See Mo. Dep't of Corr. v. Cheeney*, 926 S.W.2d 939, 942 (Mo. App. W.D. 1996) (violent conduct involving a firearm "cause[s] embarrassment to the Department"). Morton's counsel acknowledged as much, stating Morton "ma[de] a spectacle of [him]self," and that his behavior could "br[ing] shame upon the [D]epartment [Morton] works for." Morton's conduct satisfied the first part of 1 C.S.R. § 20-3.070(2)(H) in that he was "guilty of a scandalous and disgraceful conduct . . . [that] tend[ed] to bring the state service into public disrepute."

Morton's conduct satisfied the first part of 1 C.S.R. § 20-3.070(2)(H) in that he "exhibited behavior which adversely affects the employee's job performance, the employing agency, or both." Morton himself admitted that the failure to follow the law could harm his credibility with the offenders he has been charged to supervise. He also testified that his credibility is important in his dealings with the courts and law enforcement. It is self-evident that an incident such as this will cause others to question Morton's judgment, hampering him in

these interactions. *Black v. Lombardi*, 970 S.W.2d 378, 381 (Mo. App. E.D. 1998) (Department of Corrections employees are "in a very sensitive position," and conduct leading to criminal charges "could affect [an employee's] ability to gain and hold the confidence of staff and" offenders, even when the charges are subsequently dropped). Moreover, the head of the Division has indicated that he does not trust Morton to do his job, and a number of fellow employees have come forward with concerns for the safety of other Probation and Parole officers should Morton return. These concerns would hamper Morton's ability to continue performing his job. *See Snider v. Mo. Highways and Transp. Comm'n*, 356 S.W.3d 320, 325 (Mo. App. W.D. 2011) (Employee's misconduct may cause agency to "ha[ve] concerns regarding how . . . [employee's] behavior could impact his ability to work as a team with other employees . . . [and] about other employees' ability to successfully work as a team with [employee] in light of his behavior.").[7]

Morton makes no attempt to argue that his conduct did not fall within 1 C.S.R. § 20-3.070(2)(H). Rather, he argues that the dismissal notice was insufficient to put him on notice that he could be subject to termination under 1 C.S.R. § 20-3.070(2)(H), noting that the "rule [was] not cited in the termination letter."

Morton is correct that "due process requires that, before the employee can be deprived of this property interest, the employee must receive adequate notice and an opportunity for a hearing." *Lombardi v. Dunlap*, 103 S.W.3d 786, 790 (Mo. App. W.D. 2003). "To that end, Section 36.380 provides in pertinent part, '[n]o dismissal of a regular employee shall take effect unless, prior to the effective date thereof, the appointing authority gives to such employee a

---

[7] The discussions in both *Black v. Lombardi*, 970 S.W.2d 378, 381 (Mo. App. E.D. 1998), and *Snider v. Mo. Highways and Transp. Comm'n*, 356 S.W.3d 320, 325 (Mo. App. W.D. 2011), are in the context of determining whether the dismissal was "for the good of the service," the second prong of the analysis. It is in this prong where the issue of the employee's ability to effectively continue to perform the required job functions is normally reviewed. These cases are relevant here, however, because 1 C.S.R. § 20-3.070(2)(H) provides independent cause when the employee "exhibited behavior which adversely affects the employee's job performance."

10

written statement setting forth in substance the reason therefor[.]'" *Johnson v. Clements*, 344 S.W.3d 253, 257 (Mo. App. E.D. 2011). The letter must contain "adequate information about the reasons for the dismissal to enable the employee to prepare a defense." *Dunlap*, 103 S.W.3d at 790.

Here, the letter specifically notified Morton of the precise incident for which he was being terminated:

> On or about October 8, 2010, Greene County Police Officers were dispatched to your home based on a 911 call from your ex-wife. She reported that you were intoxicated and had fired two rounds from a Glock pistol. Reports indicated that you made threats to take your own life. You barricaded yourself within your house and threatened to shoot if officers forced their way in. Following an extended period of negotiation with the police, you exited your residence and were taken into custody. While in custody, you stated "My goal tonight was to kill myself and I'm so fucked up that I can't even do it."
>
> In a written statement you provided to District Administrator Bill Abbett, you admitted that on the evening of October 8, 2010, you became very intoxicated. You then exited your residence to the front porch and fired two rounds into the house with your handgun that you are certified to carry as a Probation and Parole Officer.

The letter then concluded that Morton's "actions were inappropriate, unprofessional and in violation of" three specific Department of Corrections policies, which the letter spelled out verbatim. In short, "it is clear that [Morton] knew the specifics of the misconduct charged . . . and there was no indication that he was hampered in the presentation of his defense by any misunderstanding of the charges he was facing." *Prenger*, 845 S.W.2d at 77. There is no duty upon the employer to cite a specific provision of the code of state regulations in the dismissal notice. *Id.* (rejecting a claim that the letter of dismissal had to use the language of the rule and finding it sufficient so long as the letter adequately sets forth the conduct with which the employee is charged); *see also Dunlap,* 103 S.W.3d at 790 ("While a suspension or dismissal letter need not cite the specific policy or rule the employee violated, if the specific policy or rule

is not cited, the letter must explain the policy or rule and indicate how the employee's conduct was in violation thereof.").

The dismissal letter also plainly put Morton on notice that he was being disciplined for conduct that would have a detrimental effect upon the Division, and upon his ability to continue to perform his job. Policy D2-11 Employee Standards, Section I, explicitly cautions that "[t]he manner with which an employee conducts their [sic] personal life should also display the highest professional standard and should not reflect negatively upon the Department." Policy D2-11.10, also referenced in the letter, notes that "Staff are expected to represent to the public the highest moral, ethical and professional standards and must accept as a condition of employment a code of personal conduct beyond that of a staff member in the private sector or some other public sector positions." Implicit in these policies is the understanding that violation of this higher code of personal conduct can negatively affect the public's view of the Department and the Division.

The notice of dismissal simply "must be sufficiently specific as to the time and nature of the incident at issue so that the employee has no uncertainty as to the acts related to [his] discharge." *Dunlap*, 103 S.W.3d at 790. Again, the notice explicitly stated the specific conduct at issue and quoted verbatim the specific Department policies that were violated. The notice was more than sufficient. *Johnson*, 344 S.W.3d at 258 (When the "dismissal letter cited specific DOC policies [that employee] violated and was sufficiently specific as to the time and nature of the incident at issue so that [employee] could prepare a defense[, employee] was not deprived of adequate notice[.]").

Because Morton engaged in conduct that adversely affected both his employer and his ability to continue to perform his job functions, McSwain had cause to dismiss Morton.

12

**II. Morton's dismissal was for the good of the service.**

Having determined that there was cause for the dismissal, "[t]he statute then provides a second tier of inquiry for the appointing authority, stating that before deciding to dismiss the merit employee for cause, the appointing authorities must consider whether dismissal is in the interests of efficient administration *and* whether 'the *good of the service* will be served thereby.'" *Bowen*, 46 S.W.3d at 10 (quoting § 36.380). "Although not defined by the statutes, the standard 'for the good of the service' . . . requires a decision by the appointing authority that the employee's conduct is of such a serious nature that dismissal is required rather than some other form of discipline." *Dunlap*, 103 S.W.3d at 791.

"Ultimately, the question of whether termination was for the good of the service is a matter for the agency's determination." *Snider*, 356 S.W.3d at 324. "The authority of the Board to approve or disapprove a dismissal . . . does not extend discretion . . . to override the judgment of the appointing authority that dismissal of an employee is for the good of the service." *Cheeney*, 926 S.W.2d at 941, "[a]nd 'it is not our role to substitute our judgment for that of the [agency] as to what is for the good of the service.'" *Faenger v. Bach*, 442 S.W.3d 180, 187 (Mo. App. W.D. 2014) (quoting *Snider*, 356 S.W.3d at 324). "This is not to say, however, that once an appointing authority determines that dismissal is for the good of the service, that determination is thereafter unassailable." *Id.* But this Court will review the decision only "to determine whether the agency's decision exceeded agency authority; was not based upon substantial and competent evidence on the record as a whole; was unreasonable, arbitrary or capricious; involved an abuse of discretion; or was otherwise unlawful." *Bowen*, 46 S.W.3d at 11.

Thus, while "the terms 'cause' and 'for the good of the service' are not synonymous," 1 C.S.R. § 20-3.070(5)(C)(2), "'it is not surprising that it would often be for the good of the service to terminate an employee who had given cause to do so.'" *Faenger v. Wofford*, 442 S.W.3d 190, 196 (Mo. App. W.D. 2014) (quoting *Bowen*, 46 S.W.3d at 10). Accordingly, once an agency has cause for dismissal, only in rare cases will the dismissal not also be for the good of the service. *See Atwell v. Fitzsimmons*, No. WD 77100, 2014 WL 5338532, *6 (Mo. App. W.D. Oct. 21, 2014) ("Inherent in [1 C.S.R. § 20-3.070(2), setting forth cause for dismissal] is the predetermination . . . that such conduct, when serious enough, requires termination in the interests of efficient administration."[8] (quoting *Prenger*, 845 S.W.2d at 75-76)); *see also Snider*, 356 S.W.3d at 325 ("evidence that [the employee] violated several [agency] policies" supports a finding that dismissal was for the good of the service).

In *Bach*, this Court affirmed the AHC's decision that, though an employer had cause to dismiss an employee, that the dismissal was not for the good of the service. 442 S.W.3d at 189. There, an employee was dismissed for her failure to show up for work without calling, in violation of policy. *Id*. at 184. Having proved cause for dismissal by virtue of the violation of policy, the employer's only evidence that the dismissal was for the good of the service was testimony that the employer had a "zero-tolerance policy for no-call, no-show employees." *Id*. at 188. But the AHC found credible evidence that other no-call, no-shows did not result in termination. *Id*. at 189. Thus, dismissal based on a non-existent "zero-tolerance policy" was arbitrary and capricious. *Id*.

Here, there is no dispute that the reasons testified to by McSwain are the reasons that McSwain believed dismissal was for the good of the service. The AHC determined that

---

[8] While cause and the good of the service are separate requirements to uphold a termination, conduct that constitutes cause can be of such a serious nature that it readily satisfies the good of the service requirement.

14

McSwain had considered whether other forms of discipline would be sufficient and, at the hearing, Morton's counsel referred to McSwain's testimony as "honest and forthright." McSwain testified that the conduct in question required dismissal because it reflected poorly upon the Division with the public, that it would compromise Morton's ability to work with offenders, and that it would have a negative effect upon other employees at the district office. *See Snider*, 356 S.W.3d at 325 ("concerns about other employees' ability to successfully work as a team with" the offending employee is a proper consideration in determination that dismissal was not for the good of the service).

While Morton cross-examined McSwain regarding other incidents in which employees had allegedly been convicted of crimes and not been terminated, McSwain did not testify that he dismissed Morton because he had committed "crime," or that all employees who committed crimes would be treated identically. McSwain testified that he had taken the conduct and all other circumstances, including Morton's efforts toward rehabilitation, under consideration and determined that, under the circumstances, the conduct was egregious enough to mandate dismissal. *See id*. at 325 (discipline more severe than that imposed upon other employees who had violated policy was for the good of the service). This determination is within the discretion of the agency, and was not arbitrary or capricious. *See Luttrell v. Agniel*, 343 S.W.3d 13, 17 (Mo. App. S.D. 2011) (Where the agency head testified about the rationale supporting the violated policy, problems arising from violations of the policy, and that dismissal was required for the good of the service, "[i]t would have been an abuse of the [reviewing tribunal's] discretion to overturn [the appointing authority's] judgment on that issue."); *Dunlap*, 103 S.W.3d at 791 (Where the director testified that violation of the policy "can lead to the offender population's loss of respect for staff, jealousy between offenders, and extortion of staff by

15

offenders . . .[;] that such situation directly threatens the overall safety and security of the institution"; and that "dismissal was required rather than a less severe form of discipline[, t]he [reviewing tribunal] erred in substituting its judgment for" that of the appointing authority.); *Cheeney*, 926 S.W.2d at 941-42 (When the reviewing tribunal found that a misdemeanor assault conviction "did not embarrass the Department," and dismissal was therefore not for the good of the service, it erred by "substitut[ing] its own judgment for that of the Department regarding whether [employee's] dismissal was for the good of the service."). Thus, there was substantial and competent evidence to support the finding that Morton's dismissal was for the good of the service.

## Conclusion

Because the Division had cause to dismiss Morton, and because there was substantial and competent evidence that the dismissal was for the good of the service, the circuit court's judgment overturning the AHC's determination is affirmed.

Karen King Mitchell, Presiding Judge

Cynthia L. Martin and Gary D. Witt, Judges, concur.