Thomas H. Newton, Presiding Judge
Mr. Xinsheng Gan appeals a Cole County Circuit Court judgment reversing an Administrative Hearing Commission (Commission) decision reinstating Mr. Gan for the second time to his position as a research analyst with the Missouri Department of Social Services, Division of Finance and Administrative Services (Department).[1] As the party aggrieved by the Commission decision, the Department has filed the appellant's brief and reply brief. Rule 84.05(e). The Department challenges the Commission's application of the law in concluding again that Mr. Gan's dismissal was not for the good of the service. We reverse the circuit court's judgment and affirm the Commission's decision.
As previously summarized by this Court, the record shows that in February 2013 the Department dismissed Mr. Gan after six years of employment. Schrock v. Gan , 494 S.W.3d 631, 633 (Mo. App. W.D. 2016).
[Mr. Gan] was reprimanded by the Department for various alleged offenses on multiple occasions throughout his employment. These alleged offenses included:
*129 repeatedly falling asleep at his desk during work, unauthorized internet use, scratching his leg during a meeting, and leaving a meeting early. Although the Commission recognized that "there [was] cause to discipline [Mr. Gan] ... [for] using the internet for personal reasons ... and appearing to be sleeping at his desk in January 2013 when he was in fact meditating," it found that these incidents were minor in nature. Further, it found that "[Mr. Gan's] race contributed to the appointing authority's decision to dismiss him and that his conduct was not of such serious nature as to warrant his dismissal." Accordingly, the Commission found that [Mr. Gan's] dismissal was not for the good of the service and ordered his reinstatement. In other words, the Commission decided that cultural differences unfairly contributed to a negative perception of [Mr. Gan], thus resulting in unlawful discrimination and, ultimately, the termination of his employment with the Department.
[The Department] then sought review of the Commission's decision at the Circuit Court of Cole County. The circuit court did not consider the substantive factual findings and legal conclusions of the Commission's decision. Rather, the circuit court determined that the Commission "exceeded its jurisdiction when it made a determination that race was a contributing factor in the underlying cause" (emphasis added). Instead, the circuit court decided that the "Commission can only determine if the dismissal was for racial reasons, a sole cause type analysis ... [and not just] that race was a contributing factor" (emphasis added). For these reasons, the circuit court ordered that "the cause is remanded to the Commission for issuance of its order consistent with the above analysis."
Id. Mr. Gan appealed that judgment to this Court, and, finding the appeal taken from a non-final judgment, we were precluded by law from reviewing the matter, but remanded it to the entity with jurisdiction for further proceedings. Id. at 637. We suggested that, on remand, the Commission "analyze the case on both a 'sole cause' and a 'contributing factor' analysis" in the interest of judicial efficiency, given our concerns about the circuit court's legal conclusions. Id. at 637 n.4.
The Commission subsequently determined that a full evidentiary hearing was not needed and, in March 2017, adopted its previous findings of fact, found additional facts, and concluded that Ms. Penny Schrock's decision to dismiss Mr. Gan was not based solely on his race.[2] Still, the Commission upheld its previous decision that his dismissal was not for the good of the service, in part because race contributed to Ms. Schrock's decision, and reinstated him to his position as research analyst III. The Department filed a petition for judicial review to the Cole County Circuit Court which reversed, finding that the reinstatement was in excess of the Commission's authority as it had misapplied the law and its determination was not supported by competent and substantial evidence upon the whole record. Mr. Gan timely filed this appeal.[3]
Legal Analysis
In the sole point on appeal, the Department argues that the Commission erred when it concluded that Mr. Gan's dismissal was not "for the good of the *130 service." The Department contends that the Commission misapplied the State Personnel Law, Chapter 36,[4] in that the Commission reached this conclusion despite finding that Mr. Gan "engaged in inappropriate behavior at work and had been counseled numerous times by both his previous and more recent supervisors" before his dismissal.
Our standard of review in such cases has been articulated as follows:
On an appeal from the trial court's review of an AHC [Commission] decision, we review the decision of the AHC, not the judgment of the trial court. The AHC's decision will be upheld unless it is not supported by competent and substantial evidence upon the whole record; it is arbitrary, capricious, or unreasonable; it is an abuse of discretion; or it is otherwise unauthorized by law or in violation of constitutional provisions.
In determining whether a decision is supported by competent and substantial evidence, we review the record as a whole and determine whether the AHC's decision is against the overwhelming weight of the evidence. Though we do not view the AHC's factual findings in the light most favorable to the decision, we still must defer to its credibility findings, as the AHC is the sole judge of the credibility of witnesses and the weight and value to give to the evidence. We review the AHC's conclusions on the interpretation and application of the law, however, de novo.
Cash v. Mo. Dep't of Revenue , 461 S.W.3d 57, 60 (Mo. App. W.D. 2015) (quoting Faenger v. Bach , 442 S.W.3d 180, 185-86 (Mo. App. W.D. 2014) (citations and internal quotation marks omitted) ).
Agreeing with the Commission's conclusion that the Department had cause to dismiss Mr. Gan, the Department contends nevertheless that the Commission erred in applying the law when it decided that Mr. Gan's dismissal was not for the good of the service. McSwain v. Morton , 452 S.W.3d 199, 205 (Mo. App. W.D. 2014), sets forth the two-tier inquiry an appointing authority must undertake to dismiss an employee for cause under section 36.380 by stating that "an appointing authority must first have cause to do so" and then "must consider whether dismissal is in the interests of efficient administration and whether the good of the service will be served thereby." (citations omitted). According to the Department, once the Commission found that Mr. Gan had violated several Department policies and was insubordinate for failing to follow his employer's instructions, it "did not have the authority to go further." The Department argues that, under McSwain , the Commission improperly substituted its judgment for the Department's as to whether the dismissal was "for the good of the service." We disagree. While McSwain indeed corrals the Commission's review where an appointing authority determines that dismissal is for the good of the service, and while we may not "substitute our judgment for that of the agency as to what is for the good of the service, ... [its] determination is [not] thereafter unassailable." Id. at 209.[5] The *131 appointing authority's decision may be reviewed "to determine whether the agency's decision exceeded agency authority; was not based upon substantial and competent evidence on the record as a whole; was unreasonable, arbitrary or capricious; involved an abuse of discretion; or was otherwise unlawful." Id. at 209-10. (citations omitted).
The statute does not define "for the good of the service." Still, we have indicated that, to determine whether dismissal is for the good of the service, "the appointing authority must first consider whether the employee's conduct affected either [his] ability to perform [his] job or the agency's ability to carry out its obligations." Faenger v. Wofford , 442 S.W.3d 190, 197 (Mo. App. W.D. 2014). "The appointing authority must then consider whether the conduct's effect on either the employee's ability to perform [his] job or the facility's ability to carry out its obligations was sufficiently serious as to warrant dismissal, rather than a lesser form of discipline." Id. at 198. The employing agency has the burden of establishing grounds for dismissal, thus "the appointing authority must present evidence before the [Commission] to support its consideration of each of these elements." Id.
The Commission concluded during its first review of Mr. Gan's dismissal that "[t]he only evidence in the record regarding Gan's job performance is that it was very good, and one supervisor called it 'terrific.' At the hearing, all of Gan's supervisors agreed he was not discharged for performance reasons." Clearly, whatever conduct concerns purportedly justified the dismissal, the Department did not show that they affected Mr. Gan's ability to perform his job. Nor does the Department argue in the appeal brief that they did so.
We focus then on whether the conduct's effect on the facility's ability to carry out its obligations was sufficiently serious as to warrant dismissal. In its dismissal letter, the Department outlined the various policies and rules that Mr. Gan had purportedly violated, but pointed to just three specific incidents supporting its dismissal. Two of those incidents occurred on October 9, 2012, and January 8, 2013, when Mr. Gan appeared to be sleeping at his workstation. According to the Department, such conduct represented a "failure to follow agency policies and supervisory directives" and was "unprofessional, insubordinate, and ... created an atmosphere that was disruptive." As the Commission noted on remand "all prior acts resulting in counseling were not identified in [Mr. Gan's] dismissal letter as reasons for his dismissal." And, in fact, the Department simply referred to all the prior acts by stating "[d]uring your employment, concerns have been addressed with you regarding your conduct including, but not necessarily limited to, sleeping in the workplace...." In this regard, the Commission stated during its first review that it believed Mr. Gan's testimony that, in response to the counseling he received, "he took steps to correct this [disruptive, sleeping/snoring] behavior and that he was meditating in October 2012 and January 2013 when he appeared to be sleeping."[6] Because he had not been told *132 that he should also not appear to be asleep until after the October incident, the Commission concluded that just "one incident for discipline was warranted." It also determined that when Mr. Gan meditated, "unlike when he fell asleep and snored, his conduct was not disruptive." Our review of the record supports the Commission's conclusions.
The evidence showed that Mr. Gan worked in a unit whose research analysts produced statistical reports at the request of legislators, the governor, community organizations, program managers, and quality assurance personnel. The analysts would develop the metrics needed to narrow the data into specified categories, such as "how many kids between the age of eight and sixteen had such and such abuse at the hands of such and such person." When the analysts would run their assigned jobs on the state's mainframe, it could take up to twenty minutes to generate a report. While waiting for results, it was not uncommon for analysts to close their eyes and take a rest, and they would tease each other about sleeping. The Department's witnesses claimed that sleeping on the job reflected poorly on the division because the employees worked in cubicles open to the public. Evidence showed, however, that the space in which they worked was marked "Employees Only," and the public did not come through the area. The evidence did not show that other employees were dismissed because they had slept on the job; rather, some were issued EIRs (employee incident reports), which are not considered to be "a writeup." Other employees had testified that Mr. Gan's snoring was disruptive, but he was not observed snoring in January 2013 when he claimed to be meditating.
The Department also specifically highlighted in the dismissal letter Mr. Gan's Internet usage for non-work related reasons in December 2012. The Commission noted during the first review that Mr. Gan "significantly curtailed" his Internet use after he was counseled about it in May 2012, and "[h]is principal transgression in this area in December 2012 appears to be that he occasionally accessed his Yahoo e-mail account, where he stored some [work-related] passwords, and that he viewed job postings from the University of Missouri." According to the Commission, the facts showed that Mr. Gan "could have had reason to believe that such limited activity was acceptable." Our review of the record supports this finding. The evidence showed, among other matters, that one of the division's supervisors had throughout her tenure, regardless of Internet usage policy, used a foreign language website to learn a new Spanish word every day. And, as further detailed below, a supervisor's secretary regularly sent out job notices to employees with links to other state agency websites, thus giving the impression that employees could access them from their workstation computers. One of Mr. Gan's fellow research analysts testified that he checked game scores and weather-related sites online; there is no evidence that he was similarly counseled and disciplined for this usage. While the Commission found that this individual was also Asian, he was American-born and had no accent. According to the Commission, the evidence did not show that supervisors "perceived the same 'language and cultural barrier' with him that they felt they had with [Mr.] Gan."
The Commission concluded that, while this use violated certain Department policies, these violations did not warrant dismissal. In sum, on the basis of all the factors in the case, the Commission determined that the dismissal was not for the good of the service. It described those factors as follows:
*133 the apparent toleration for and mixed messages regarding modest amounts of non-work-related internet use, the stress Gan felt during 2012 and 2013 that led to his need to meditate at work, the fact that he was not warned to 'appear not to be sleeping' until October 2012, the uncontested quality of Gan's work, and our conclusion that racial factors contributed to the decision to dismiss him.
We do not view this consideration of a variety of factors, including race, which all bear on whether Mr. Gan's conduct affected the agency's ability to carry out its mission, as improper.
In the Department's view, the Commission further erred in "recasting [Mr.] Gan's conduct as consisting of 'minor incidents,' viewing specific incidents in isolation rather than as a pattern of disruptive behavior." The Department also argues that, while Mr. Gan appealed his dismissal by alleging that it was for (1) racial reasons and (2) not for the good of the service, the Commission erroneously conflated the two grounds. Moreover, the Department claims that the Commission made no findings showing direct evidence of discrimination or that other employees with the same patterns of behavior were treated more favorably. These arguments are related, and we address them with reference to the Commission's findings, which are supported by substantial evidence in the record.
The Commission in its first review found that Mr. Gan had violated just two of the five grounds for dismissal the Department cited. The first was that the employee "[ (K) ]. has been guilty of insubordination or has failed to respond in a reasonable manner to lawful orders or instructions of persons with duly delegated authority over the employee." 1 C.S.R. 20-3.070(2)(K). As to Mr. Gan's Internet use, the Commission found that he was neither insubordinate nor failed to respond reasonably to his supervisor's instructions. In this regard, it stated the following:
After [Mr.] Gan was counseled about his internet use in April 2012, he curtailed it significantly. He told his supervisors he would limit it to occasionally checking his Yahoo e-mail account for work-related reasons. [His unit manager Ms.] Sprenger found his response satisfactory.
In December, [Mr.] Gan occasionally accessed his Yahoo e-mail account, and he viewed job postings from other state agencies, including those from the University of Missouri. The record reflects that [division director Ms.] Tidball's secretary sent links to state job postings from her own e-mail; there is no other inference to be drawn but that viewing such postings was an approved, or at least a tolerated, activity. Although [Ms.] Schrock draws a distinction between job postings from the University of Missouri and other state agencies, one can readily understand that an employee might not appreciate that fine distinction. Even [Ms.] Tidball agreed that it could be reasonable for an employee who was sent job postings for state agency jobs by her secretary to believe that it could be appropriate to search the University of Missouri jobs Web site if they did so on their breaks or their lunchtime. Tr. 195.
That a lack of clarity over the workplace Internet policy was endemic is supported by a co-worker's testimony that looking up scores is work-related because it might be motivated by a conversation with another employee about sports, and checking the weather online was justified by the need to know what conditions would be like on the drive home. Also, at different times, division employees were told that as part of *134 their performance expectations they should stay current with news by viewing news sites on their computers or stop viewing news sites altogether. Mr. Gan was observed viewing Chinese language news websites, which is not surprising given that he spent his first twenty-seven years of life as a Chinese national. Still, he ceased doing so when counseled to stop. The Commission specifically found that his occasional usage in December 2012, despite claims that unauthorized Internet use encroached on the bandwidth necessary to run the Department's computer programs, did not harm the agency.
Supervisors and other employees also viewed non-work-related Internet sites. The co-worker who sent Mr. Gan non-work-related links that she thought would be of interest to him was investigated for her Internet use after Mr. Gan told a supervisor about it. The human resources investigation found that this employee had visited a job-search website, Twitter, and You Tube, but she was not counseled on her Internet use. The record supports the Commission's conclusion that, while Mr. Gan's non-work-related Internet usage violated a work policy, it was not a serious violation in that it had not disrupted the workplace. The Department complains that the Commission viewed this conduct in isolation rather than as a pattern of disruptive behavior, but did not show how Mr. Gan's use differed from that of other employees and supervisors who were neither reprimanded nor dismissed for their conduct.
The second ground that the Commission found Mr. Gan had violated was (L.), "has willfully violated the lawful regulations or policies of the agency by which employed after having been made aware of the regulations and policies." 1 C.S.R. 20-3.070(2)(L). While the Commission determined that cause for dismissal existed because Mr. Gan had meditated at his desk in January 2013 after being counseled not to appear to be sleeping at his workstation and because he had accessed the Internet at work for personal reasons also after counseling, it did not regard the transgression as sufficiently serious that his dismissal was for the good of the service. In this regard, the Commission stated as follows:
[Mr.] Gan violated the Department's policies regarding internet usage. Pursuant to 1 CSR 3.070(2)(L), that is cause to discipline or dismiss an employee. But nearly all of the employees who testified in this case, including several of [Mr.] Gan's supervisors ... admitted that they also accessed non-work-related Web sites from their work computers, and the record reflects that a [co-worker] who sent [Mr.] Gan non-work-related links was not disciplined. If every employee who admitted such usage in this case were dismissed, DFAS' [the Division of Finance and Administrative Services] workforce would be decimated.
Furthermore, the record reflects that while [unit manager Ms.] Sprenger issued EIRs [employee incident reports] to two other employees in DFAS who fell asleep, she did not do so until [Mr.] Gan complained to her that he had been singled out and treated unfairly. Although [Ms.] Sprenger denied she knew that [Ms.] Brooks had fallen asleep in a meeting (a more public venue than a work station) in August 2012 until [Mr.] Gan told her about the incident, another employee testified that she had told [Ms.] Sprenger about the incident the day after it happened. We give greater credit to the latter testimony; that employee was one of the Department's witnesses who also testified that she had told her supervisors about [Mr.] Gan's sleeping at his desk. [Immediate supervisor Ms.] Kniest also witnessed [Ms.] Brooks fall asleep at the meeting, but *135 did not report it until after [Mr.] Gan complained.
In this regard, the case is on all fours with Faenger v. Bach , where we determined that the agency, a state-run nursing home for veterans, failed to carry its burden of showing that dismissal, rather than some lesser punishment, was for the good of the service. 442 S.W.3d at 182, 188. There, the evidence showed that the agency had a zero-tolerance policy for employees who failed to call or show up for their shifts, but in practice the policy was not evenly enforced. Id. at 189. This led the Commission to conclude that testimony about the importance of the zero-tolerance policy in terms of ensuring adequate staffing levels was not credible. Id.
Here, the Commission also reflected on the "relative seriousness" of the conduct and uneven application of Department policy, noting that "modest use of the internet for non-business reasons seems to have been a widespread practice in DFAS-again leading to a perception that such limited use was tolerated." The Commission was more troubled by Mr. Gan's sleeping at work and found that before September 2011, his sleeping and snoring disrupted other employees. Still, the Commission viewed his conduct in context:
[W]e believe [Mr.] Gan's testimony that he took steps to correct this behavior and that he was meditating in October 2012 and January 2013 when he appeared to be sleeping. Having been reprimanded for such behavior in October 2012, [Mr.] Gan should not have meditated at his desk again. Again, however, we consider the context.
[Mr.] Gan was clearly feeling considerable work-related stress in the fall of 2012 and winter of 2013. His blood pressure was high despite attempts to control it with medication. It was reasonable for him to supplement that medical treatment with the traditional Chinese practice of meditation. After he told his supervisors that he was meditating instead of sleeping in October, they told him he could meditate in the break room, but the break room contained vending machines and was not a quiet place. In the written reprimand [Mr.] Gan was given in October 2012, he was not told he could not meditate, but that he should not appear to be asleep.[7]
Thus one incident of appearing to be asleep at his workstation and Internet use that went unsanctioned in others, specifically cited in the dismissal letter as reasons for Mr. Gan's dismissal, cannot seriously be characterized as conduct so detrimental to the agency as to justify his dismissal, rather than some lesser form of disciplinary action, "for the good of the service." We conclude therefore that the Department did not carry its burden of showing that Mr. Gan's dismissal was for the good of the service.
Regarding the Commission's finding that race, a separate statutory ground for challenging dismissal, contributed to the Department's decision to dismiss Mr. Gan, the Commission found credible his perception that he was singled out for criticism and scrutiny by his supervisors. The Commission summarized the evidence by stating,
[Mr. Gan] was the only employee [Ms.] Kniest ever required to e-mail her upon arrival and departure each day, and the only employee [Ms.] Spraggs ever denied the use of requested sick leave.
*136 [Mr.] Gan was admonished for scratching his leg in a meeting and his cubicle was moved approximately ten feet from a space with a window to a space without a window so he could be "closer" to people he worked with. His supervisors clearly did not believe he was meditating in October 2012 and January 2013, despite his repeatedly telling them that he was.
At the hearing, [Ms.] Sprenger testified that she did not know that [Mr.] Gan was Asian, although she "suspected that could be the case" (Tr. 411)-even after having described him as such to the Capitol Police, and hearing and making multiple references to the Chinese Web sites [Mr.] Gan was seen viewing in April 2012.... All of this evidence lends credence to the inference that [Mr.] Gan's supervisors were uncomfortable with him, and treated him differently from other employees because of his race.
On the basis of this record, there was sufficient evidence, direct or otherwise, that Mr. Gan was singled out for observation and discipline on the basis of his ethnic origin. He was subjected to regimens not required of other employees, and his claims of disparate treatment were found to lack merit by human resources personnel who had never found probable cause for a single civil-rights violation in his division. Behavior that was tolerated in others, including supervisors, was the basis for his dismissal. Under the law in effect when the dismissal occurred, discrimination that contributed to an adverse employment action was not lawful.[8] This point is denied.[9]
Conclusion
Finding no error in the Commission's determination that the Department failed *137 to show that dismissal was for the good of the service, we reverse the circuit court's judgment and affirm the Commission, which reinstated Mr. Gan to his position as research analyst III in the Division of Finance and Administrative Services. We remand for the Commission to consider Mr. Gan's motion for attorney fees and costs.
Cynthia L. Martin, and Gary D. Witt, JJ. concur.

This matter has been before this Court previously, when Mr. Gan appealed a non-final circuit court decision that reversed and remanded on the ground that the Commission had used the wrong legal standard in deciding whether Mr. Gan's dismissal was for "racial reasons." Schrock v. Gan , 494 S.W.3d 631, 632, 637 (Mo. App. W.D. 2016) (determining that we lacked jurisdiction and remanding to the Commission as the entity with jurisdiction).

Note that the Commission indicated that, in both the June 4, 2014, and March 13, 2017, decisions, its findings of fact reflected its judgment as to credibility.

We have taken with the case Mr. Gan's motion for attorney fees.

Statutory references are to RSMo Cum. Supp. 2013, unless otherwise indicated.

See also Faenger v. Wofford , 442 S.W.3d 190, 197 (Mo. App. W.D. 2014) (noting that Legislature gives employees the right to appeal "setting forth in substance the employee's reasons for claiming that the dismissal ... was for political, religious, or racial reasons, or not for the good of the service."). We observed in Faenger that the statute would not give an employee this opportunity "unless the legislature intended that the reviewing body then determine whether termination was ... not for the good of the service, and, if it finds that this was the basis of termination, to reverse the decision." Id. (citations omitted). Mr. Gan asserted, among other matters, that he was dismissed for racial and national origin reasons as well as "not for the good of the service."

On remand, the Commission found additional facts supporting the Department's reference to prior acts requiring counseling, i.e., that Mr. Gan had been observed and warned about sleeping at his desk a number of times before the final incidents set forth in the dismissal letter, he lifted his pant leg to scratch his knee during a meeting, and he left that meeting ten minutes early to continue working on a project.

When Mr. Gan's supervisors testified, all of them admitted that they knew little or nothing about the practice of meditation, leading to the reasonable inference that they also chose not to find out more about it after Mr. Gan told them that, rather than sleeping, this was what he was doing to calm himself and improve his productivity.

On remand, the Commission cited Templemire v. W & M Welding, Inc. , 433 S.W.3d 371, 383-84 (Mo. banc 2014), and Daugherty v. City of Maryland Heights , 231 S.W.3d 814, 819 (Mo. banc 2007), to which we had referred in questioning the circuit court's direction to the Commission to find whether race was the sole reason for Mr. Gan's dismissal. Schrock , 494 S.W.3d at 635. While Daugherty has been abrogated by Missouri Human Rights Act amendments that took effect in August 2017, the Eighth Circuit Court of Appeals noted that our circuit courts have uniformly determined that such changes were substantive and thus did not apply retrospectively. Hurley v. Vendtech-SGI, LLC , No. 16-01222-CV-W-ODS, 2018 WL 736057, *3-*4 (W.D. Mo. 2018) (addressing Legislature's shift of burden of proof and changed causation standard from contributing factor to motivating factor).

Mr. Gan has filed a motion for reasonable attorney fees and costs under section 536.087, RSMo. (2016), and Western District Rule XXIX. As the prevailing party before the Commission, he twice filed an application for attorney fees and costs before that body. Where the State appeals the agency determination, "the tribunal before which the fee application was properly brought will retain jurisdiction over that fee application, and the action will be held in abeyance until the adversary proceeding becomes final." Mo. Real Estate Appraisers Comm'n v. Funk , 492 S.W.3d 586, 593 (Mo. banc 2016) (citations omitted). Observing that this request need not be repeated at "each succeeding level of the process to recover attorney's fees expended on appeal in defense of the AHC decision in the party's favor," the supreme court further stated,
Once the proceeding becomes final through an unreviewable decision by a court on appeal, or once the underlying merits of the case are finally determined on appeal, the agency can then determine the attorney's fees awardable, if any, and that award can include fees incurred in the trial and appellate courts in defending the agency decision.
Id. Because our decision is not unreviewable, the question of attorney fees under section 536.085 is not yet ripe. We would, in any event, have remanded the case to the Commission "with directions to determine the award of attorney's fees." Id. at 595 n.6.